# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CROWLEY GOVERNMENT SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GENERAL SERVICES ADMINISTRATION, *et al.*,<br><br>Defendants. | Civil Action No. 21-2298 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Crowley Government Services, Inc. ("Crowley") brings this action against the General Services Administration and its Administrator (collectively, "GSA"), seeking equitable relief to stop GSA's alleged ongoing practice of interfering with payments due plaintiff pursuant to a contract with the U.S. Transportation Command ("USTRANSCOM"), a unit of the Department of Defense.  Compl. ¶¶ 1–11, ECF No. 1.  GSA is not a party to the contract underlying this dispute, *id.* ¶ 40, but in performing its auditing function has adopted and persists in applying a different interpretation of plaintiff's contract than that of the actual contracting party USTRANSCOM, *id.* ¶¶ 40–69, leaving plaintiff in the difficult and expensive circumstance of performing under the contract but without getting paid the amounts that both contracting parties apparently believe to be owed.

Plaintiff seeks an order preliminarily enjoining defendants from "auditing invoices submitted by Crowley to [USTRANSCOM] under Crowley's contract with USTRANSCOM" and "to the extent GSA has any authority to audit Crowley's invoices, making audit determinations regarding the validity of those invoices that are inconsistent with the Contracting Officer's final and conclusive decisions regarding the interpretation of the contract and

1

Crowley's performance under the contract."  Pl.'s Mot. Prelim. Inj. ("Pl.'s Mot.") at 1–2, ECF No. 9.  In response, GSA moves to dismiss the case, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), contending that "this Court lacks jurisdiction over Plaintiff's claims for several independent reasons and the complaint fails to state a valid claim under the Administrative Procedure Act."  Defs.' Mot. Dismiss ("Defs.' Mot.") at 1, ECF No. 13.  Most importantly, GSA argues that the United States Court of Federal Claims ("CFC")—in which plaintiff also has pending a complaint arising from the same events—has exclusive jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491.  Defs.' Mot. at 1; *see also* Defs.' Mem. Supp. Mot. Dismiss & Opp'n Pl.'s Mot. Prelim. Inj. ("Defs.' Opp'n") at 7–21, ECF No. 13; Defs.' Reply Supp. Mot. Dismiss ("Defs.' Reply") at 2–8, ECF No. 19.

For the reasons discussed below, GSA's Motion to Dismiss is granted, under Federal Rule of Civil Procedure 12(b)(1), and plaintiff's Motion for Preliminary Injunction must be denied as moot.[1]

## I.      BACKGROUND

### A.      Factual Background

Plaintiff is a company that "provides marine solutions, energy, and logistics services in domestic and international markets."  Compl. ¶ 12.  Unfortunately for plaintiff, as noted, the instant dispute arises from a government contract that is apparently differently interpreted by two government agencies.

---

[1]      GSA also moves in the alternative to dismiss for failure to "identify final agency action subject to current judicial review," pursuant to Federal Rule of Civil Procedure 12(b)(6).  Defs.' Mot. at 1.  "As the finding that subject-matter jurisdiction has not been established requires that the case be fully dismissed, this alternative ground for dismissal need not be addressed.  *Rosenkrantz v. Inter-Am. Dev. Bank*, No. 20-cv-3670 (BAH), 2021 WL 1254367, at *1 n.1 (D.D.C. Apr. 5, 2021).

### 1.   *Plaintiff's Contract with USTRANSCOM*

On November 22, 2016, USTRANSCOM awarded, to plaintiff's predecessor-in-interest, Contract No. HTC711-17-D-R003 ("Contract"), under which plaintiff now "provides various logistical, planning, and transportation coordination services to assist USTRANSCOM with managing a large and complex network of moving goods and cargo for the Department of Defense." Compl. ¶¶ 19–21.

Under the Contract, plaintiff receives shipping orders from government shippers specifying the origin, destination, and other attributes of desired cargo shipments within the continental United States. Compl. ¶¶ 30, 34. In response, plaintiff plans and coordinates the transportation of the shipments from end to end—selecting, scheduling, and paying various types of subcontractors to perform the actual handling and movement of the cargo. *Id.* ¶¶ 31–32, 35. The Contract sets forth certain performance standards for delivery timeframes and allowable reasons for deviations from those standards (*e.g.*, inclement weather), *id.* ¶¶ 36–37, as well as certain conventions for the computation of shipping timeframes (*e.g.*, the treatment of weekends and holidays), *id.* ¶¶ 38–39.

Since inception of the Contract, plaintiff has provided this shipping service for roughly 1.2 million shipments. Compl. ¶ 33. Plaintiff does not in the instant case register any grievances as to USTRANSCOM's performance under the Contract, nor does it indicate that the parties to the Contract materially disagree as to its essential terms.

### 2.   *GSA Involvement*

Plaintiff's complaint arises from allegedly unwanted, extracontractual, and erroneous interventions by GSA, in the form of Notices of Overcharge ("NOCs"), after the invoicing phase of shipments. Specifically, GSA "audit[s] Crowley's invoices to USTRANSCOM and assess[es]

NOCs against Crowley," Compl. ¶ 42, despite being neither a party to the Contract nor expressly contemplated by the Contract to have a role in its administration, *id.* ¶¶ 40–41.  Broadly speaking, GSA's disagreements with plaintiff's invoices include the applicability of allowed exceptions to expected delivery timelines, *id.* ¶ 43, the method of counting days when measuring actual delivery performance, *id.* ¶¶ 45–46, and issues stemming from alleged errors in government paperwork or limitations in government booking systems, *id.* ¶¶ 47–52.

The Contract, according to plaintiff, contains a "disputes clause" whereby plaintiff may "pursue claim[s] for relief" with the appropriate Contracting Officer at USTRANSCOM for such matters as the perceived GSA interference with invoicing and payment processes.  *See* Compl. ¶ 54.  Over the course of 2020, plaintiff made a claim regarding "a sample of" GSA's NOCs, representing the various categories of disputed issues, with the Contracting Officer, resulting in the Contracting Officer issuing three Final Decisions that same year, indicating substantive agreement with plaintiff on the disputed matters and concluding with respect to each that "'NOCs should not have been issued.'"  *Id.* ¶¶ 55–69 (quoting Compl., Ex. C, Contracting Officer's Final Decision Regarding Certified Claim ("December 2020 Final Decision") ¶ 3, ECF No. 1-4).[2]  The Contracting Officer observed that although "GSA was provided an opportunity to validate its issuance of [NOCs] disputed in this claim," GSA "declined to provide a meaningful or thorough response" and as a result the NOCs "are not factually supportable, and, hence, are not valid."  Compl. ¶ 68 (quoting December 2020 Final Decision ¶ 3(a)).

---

[2]    The claim involved 168 NOCs covering services rendered in April 2018, totaling $119,483.03.  December 2020 Final Decision at 1; *id.* ¶ 1(d).  The Contracting Officer agreed that the NOCs were erroneous to the full extent of plaintiff's claim but reduced its determination of the refund due plaintiff by $43,067.50 because it turned out that, unbeknownst to both plaintiff and USTRANSCOM, GSA had already partially refunded some of the NOC amounts. *Id.* ¶¶ 2(e), 3(a).

The December 2020 Final Decision explained the mechanism by which GSA's offsets were collected.  USTRANSCOM employs a third-party payment system, operated by a bank, through which GSA "unilaterally applie[s] off-sets to future payments to Crowley" pursuant to the NOCs, without coordinating such offsets with USTRANSCOM or the Defense Logistics Agency ("DLA").  December 2020 Final Decision ¶ 3(f)(1).  When this happens, DLA has already paid the bank for the full amount of the invoice, *id.*, but GSA deducts the NOC amount from a payment due from the bank to plaintiff, with the proceeds (net of collection expenses) ultimately destined for a miscellaneous receipts account with the Treasury, *id.* ¶ 3(f)(2) (citing 31 U.S.C. § 3726(d), (f)).  The Contracting Officer described these funds as "remain[ing] in GSA's possession" and noted that USTRANSCOM lacked authority either to direct GSA to reimburse plaintiff or to direct a disbursement from the miscellaneous receipts Treasury account.  *Id.* Therefore, according to the Contracting Officer, "recovery of these funds is through the GSA Post-Payment Audit dispute process, appealable to the Civilian Board of Contract Appeals [("CBCA")] or the U.S. Court of Federal Claims."  *Id.*; *see also* 41 C.F.R. § 102-118.650 (enumerating the CBCA and the CFC as avenues for review of "a settlement action taken by the Administrator of General Services").  USTRANSCOM thus was unable to refund the disputed amount to plaintiff despite agreeing that plaintiff was entitled to those funds.

Plaintiff reports that even after the December 2020 Final Decision, "GSA continues to issue NOCs."  Compl. ¶ 70.  "In June 2021 alone, Crowley received over 11,000 NOCs" from GSA.  *Id.* ¶ 73.  At the time of filing the complaint, plaintiff had accumulated 50,593 NOCs totaling roughly $37 million "[s]ince 2018."  *Id.* ¶ 72.[3]  To avoid having offsets imposed on its

---

[3]     The figures provided by plaintiff suggest that over 20% of the NOCs received since 2018 arrived in the single month of June 2021, which would be a roughly eight-fold increase over the average rate of NOC issuance over the past several years.  It is unclear, however, whether this proportion indicates a durable increase in the volume of NOCs in recent months or whether June 2021 was an extreme outlier month for some reason.

payments from USTRANSCOM, plaintiff must promptly research and dispute each NOC.  *Id.*
¶¶ 71, 74.  This volume of NOCs, plaintiff alleges, exceeds plaintiff's capacity to manually
process, causing plaintiff to "use software to quickly categorize the basis for each of the NOCs"
and then submit disputes in aggregate fashion, a process that still entails substantial management
time.  *Id.* ¶¶ 76–79.  All told, "[t]he enormous resources required to address the NOCs harm
Crowley's ability to adequately perform the contract."  *Id.* ¶ 87.

    **B.**    **Procedural Background**

        **1.**    ***Plaintiff's Action Before the Court of Federal Claims***

On May 27, 2021, plaintiff filed suit against USTRANSCOM in the United States Court
of Federal Claims for failure to pay amounts due under the Contract.  Compl. ¶ 1, *Crowley Gov't
Servs., Inc. v. United States*, No. 21-cv-1405 (PEC) (Fed. Cl. May 27, 2021), ECF No. 1 ("CFC
Compl.").  In one count, plaintiff alleged breach of contract and sought money damages totaling
$117,633.81 because "[t]he contract does not authorize the GSA to issue NOCs" and
USTRANSCOM failed to provide payment compensating for the improper offsets despite
agreeing with plaintiff on the amounts due.  *Id.* ¶¶ 49–55.[4]  In a second count, citing GSA's
ongoing issuance of NOCs despite the Contracting Officer's findings agreeing with plaintiff,
plaintiff sought a declaratory judgment confirming, *inter alia*, "the GSA's lack of authority to
issue setoffs."  *Id.* ¶¶ 57–60.

The United States, on behalf of USTRANSCOM, moved on August 9, 2021 to dismiss
the complaint in the CFC.  Def.'s Mot. Dismiss at 1, *Crowley*, No. 21-cv-1405 (Fed. Cl. Aug. 9,

---

[4]    As in the recitation of facts above, this amount is "for services performed in April 2018 and the subject of
the Contracting Officer's December 30, 2020 final decision."  CFC Compl. ¶ 12.  The reason that this value slightly
differs from the $119,483.03 amount stated in the referenced Final Decision is not apparent, nor does the allegation
in the CFC Complaint clearly account for the $43,067.50 that the Final Decision indicated had already been
refunded to plaintiff.

2021), ECF No. 7 ("CFC Mot. Dismiss").  USTRANSCOM argued that "[a]s currently constructed, Crowley's complaint must be dismissed pursuant to [CFC Rule] 12(b)(6) for failure to state a claim upon which relief can be granted."  *Id.* at 2.  USTRANSCOM characterized plaintiff's demand for declaratory relief as a "blanket attack on the Transportation Act," providing in relevant part that "[the GSA] Administrator may conduct pre- or post-payment audits of transportation bills of any Federal agency," *id.* at 4–5 (quoting 31 U.S.C. § 3726(b)), which is precisely what GSA did.  Furthermore, in the Contract itself plaintiff "expressly agreed to 'support Government agency reviews and audits of all services.'"  *Id.* at 5.  With respect to the breach of contract claim, USTRANSCOM reiterated that the Contract allowed for GSA audits, and in any event USTRANSCOM did deposit the full invoiced amounts to the bank and had no statutory authority to issue a duplicate payment in response to GSA's offsets.  *Id.* at 7–8.  Finally, while concluding that "no contractual cause of action exists here," USTRANSCOM reminded that "Crowley is not without recourse," referring back to the Contracting Officer's explanation, quoted in the complaint itself, of remedies available through the dispute process for *GSA* audits.  *Id.* at 9.

On August 26, 2021, plaintiff filed an amended complaint in its CFC docket, identifying both USTRANSCOM and GSA as defendants.  First Am. Compl. ¶¶ 16–17, *Crowley*, No. 21-cv-1405 (Fed. Cl. Aug. 26, 2021), ECF No. 8 ("CFC Am. Compl.").  In its first count, the complaint reiterated the breach of contract claim against USTRANSCOM for nonpayment, *id.* ¶¶ 90–97, including detailed allegations regarding how any inter-agency disputes or perceived limitations on USTRANSCOM's authority to pay are issues to be worked out by USTRANSCOM, not by plaintiff, *see id.* ¶¶ 56–67.  Plaintiff no longer sought declaratory relief against USTRANSCOM, but added a second count arguing, in the alternative, that even if GSA had statutory authority to

conduct post-payment audits and offsets, its NOCs were unlawful as they were based on an "incorrect interpretation of the contract." *Id.* ¶¶ 99–102. Plaintiff's alternative count included a demand for an additional $11,880,997.99, reflecting additional NOCs which GSA had issued but were pending review by the USTRANSCOM Contracting Officer. *Id.* ¶ 13, 101.[5]

On August 30, 2021, CFC denied the motion to dismiss as moot because the complaint had by that point been amended, and directed the government to answer or respond by September 20, 2021. Order, *Crowley*, No. 21-cv-1405 (Fed. Cl. Aug. 30, 2021), ECF No. 10. The government filed its answer accordingly and to date has not filed a renewed motion to dismiss. *See* Def.'s Answer, *Crowley*, No. 21-cv-1405 (Fed. Cl. Sept. 20, 2021), ECF No. 12.

**2.    *Plaintiff's Action in this Court***

On August 30, 2021—four days after filing its amended complaint in the CFC—plaintiff filed the instant two-count complaint in this Court seeking "declaratory and injunctive relief against GSA" (and not against USTRANSCOM) "to stop it from interfering with" the Contract between plaintiff and USTRANSCOM. Compl. ¶ 1. In Count I, plaintiff invokes the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, alleging that GSA exceeded, and continues to exceed, its statutory authority by conducting its improper audits and issuing erroneous NOCs. Compl. ¶¶ 114, 116, 117. As a result, plaintiff asserts that GSA's actions should be held unlawful and set aside under the APA. *See id.* ¶ 109. In Count II, plaintiff alleges in the alternative that "GSA's actions are *ultra vires*" warranting judicial review and injunctive relief because "no other remedy is available." *Id.* ¶¶ 128–29. Plaintiff stresses

---

[5]    This additional sum alleged only against GSA apparently reflects the view that with respect to these additional NOCs, GSA had taken an unlawful action by issuing erroneous offsets, but USTRANSCOM had *not* yet breached the contract as those amounts were still in the process of Contracting Officer review. "If payment is denied, as anticipated, Crowley will bring a direct action on those decisions, as well, and incorporate the larger amount into this case." CFC Am. Compl ¶ 13.

that no contractual remedy or money damages are sought against GSA (or USTRANSCOM). *Id.* ¶¶ 99–102. Instead, plaintiff seeks only equitable relief prospectively precluding the GSA from conducting audits and issuing NOCs contrary to the interpretations of the Contracting Officer. *Id.* ¶ 107; *id.* at 18 (Prayer for Relief).

Plaintiff moved for a preliminary injunction on September 1, 2021, seeking to enjoin GSA from auditing plaintiff's invoices to USTRANSCOM or, if such audits are authorized, issuing decisions and NOCs contrary to the findings of the Contracting Officer's interpretation of the contract. Pl.'s Mot. at 1–2. Following a briefing schedule set by the parties, GSA responded on September 15, 2021, with a motion to dismiss combined with an opposition to plaintiff's motion for preliminary injunction. *See* Defs.' Mot.; Defs.' Opp'n. At the Court's request, *see* Min. Order (Sept. 16, 2021), the parties proposed a revised briefing schedule to complete combined briefing on the two pending motions.[6] Briefing completed on October 8, 2021, with the filing of plaintiff's sur-reply.[7]

## II.   LEGAL STANDARD

To survive a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), plaintiffs bear the burden of demonstrating the court's subject-matter jurisdiction over their claims by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).

---

[6]      The parties' original proposed briefing schedule—before GSA filed its motion to dismiss—requested a hearing the "[w]eek of September 27," Joint Proposed Briefing Schedule at 1, ECF No. 11, at least 26 days after plaintiff filed its motion for preliminary injunction. Once GSA filed its motion to dismiss, the parties proposed a briefing schedule providing for a full month of briefing on the two pending motions, *see* Joint Proposed Briefing Schedule at 1–2, ECF No. 15. Each proposal exhausted the entirety of the 21-day window the Court ordinarily sets as an objective for hearings (let alone decisions) on motions for preliminary injunction. *See* D.D.C. LOCAL CIVIL RULE 65.1(d).

[7]      Plaintiff's sur-reply identified nine topics on which GSA's reply in support of its motion to dismiss allegedly introduced "misrepresentations of fact and law." Pl.'s Sur-Reply Resp. Defs.' Reply Supp. Mot. Dismiss at 1, ECF No. 21-1. Plaintiff was granted leave to file this sur-reply as it contained information helpful in assessing GSA's reply, but the issues identified in that filing are only addressed as pertinent to the analysis herein.

"[F]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'" *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (second alteration in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton*, 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). They therefore have a corresponding "independent obligation to ensure that they do not exceed the scope of their jurisdiction" and "must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Absent subject-matter jurisdiction over a case, the court must dismiss it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

When considering a motion to dismiss under Rule 12(b)(1), the court must accept as true all uncontroverted material factual allegations in the complaint and "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged' and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)); *see also Valambhia v. United Republic of Tanzania*, 964 F.3d 1135, 1139 (D.C. Cir. 2020) ("Where . . . the 'defendant contests only the legal sufficiency of plaintiff's jurisdictional claims, the standard is similar to that of Rule 12(b)(6), under which dismissal is warranted if no plausible inferences can be drawn from the facts alleged that, if proven, would provide grounds for relief.'" (quoting *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018))). The court need not accept inferences drawn by the plaintiff, however, if those inferences are

unsupported by facts alleged in the complaint or amount merely to legal conclusions.  *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).

When a jurisdictional challenge "present[s] a dispute over the factual basis of the court's subject matter jurisdiction . . . the court must go beyond the pleadings and resolve" any dispute necessary to the disposition of the motion to dismiss.  *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (alterations in original) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  In such situations, "the . . . court may properly consider allegations in the complaint and evidentiary material in the record," affording the plaintiff "the benefit of all reasonable inferences."  *Id.*; *see also Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016) ("In considering a motion to dismiss for lack of subject matter jurisdiction," the court "'may consider materials outside the pleadings . . . .'" (quoting *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005))).

## III.    DISCUSSION

Plaintiff entered into a contract with USTRANSCOM and performs various services in fulfillment of that contract.  Plaintiff has not received, and is not receiving, payment from USTRANSCOM in the full amount plaintiff—and even USTRANSCOM's Contracting Officer—believes to be due.  Plaintiff understandably wishes to be consistently paid in full and brings legal actions in multiple courts in pursuit of that result.

Viewed in that context, the disposition is straightforward: plaintiff has a contract dispute with the government exceeding $10,000 in value, and the forum prescribed by statute to hear such disputes is the Court of Federal Claims, not this or any other district court.  To be sure, some details complicate this straightforward analysis, due to the involvement of an agency (GSA) not a party to the contract, as well as some questions raised as to precisely which statutes

govern the auditing of these invoices and the process for challenging the result of such audits.  In

the end, however, none of these issues detract from the essential conclusion that this Court has

no jurisdiction to hear this dispute and must grant GSA's motion to dismiss.

The analysis proceeds in three steps: first, an overview of how sovereign immunity is

affected by the interaction between the APA and the Tucker Act; second, a discussion of why the

Tucker Act applies in this case; and finally, a rejection of plaintiff's alternative argument

attempting to create jurisdiction by alleging *ultra vires* conduct.

### A.      Sovereign Immunity

As an initial matter, the law is well settled that the United States and its agencies are

immune from suit in federal courts absent a clear, "unequivocally expressed," waiver of that

sovereign immunity, such as by an act of Congress.  *Mowrer v. U.S. Dep't of Transp.*, No. 19-

5321, 2021 WL 4343305, at *3 (D.C. Cir. Sept. 24, 2021); *see also United States v. White*

*Mountain Apache Tribe*, 537 U.S. 465, 472 (2003).  As relevant here, the APA provides a limited

waiver of sovereign immunity for claims challenging final agency action and seeking non-

monetary relief for persons "adversely affected or aggrieved by agency action."  5 U.S.C. § 702

("An action . . . seeking relief other than money damages and stating a claim that an agency . . .

acted or failed to act . . . shall not be dismissed nor relief therein be denied on the ground that it

is against the United States . . . ."); *id.* § 704.  In this case, the question of subject matter

jurisdiction turns entirely on whether GSA and its Administrator are immune from suit on the

claims in this Court.

Meanwhile, the Tucker Act, 28 U.S.C. § 1491, separately offers another limited waiver of

sovereign immunity, providing in relevant part that "[t]he United States Court of Federal Claims

shall have jurisdiction to render judgment upon any claim against the United States founded . . .

upon any express or implied contract with the United States."  *Id.* § 1491(a)(1).  The D.C. Circuit

has consistently interpreted the Tucker Act as "confer[ring] *exclusive* jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims." *Hammer v. United States*, 989 F.3d 1, 2 (D.C. Cir. 2021) (emphasis added) (citing 28 U.S.C. §§ 1346(a), 1491(a)).[8]  Where the CFC has jurisdiction over a case, "the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." *Id.* § 1491(a)(2).

Although the Tucker Act, by its own terms, never furnishes a waiver of sovereign immunity in a district court—and plaintiff does not attempt to invoke this Act here to that end— it is relevant to the jurisdictional analysis because of its effect on the APA's waiver provision. The APA's sovereign immunity waiver does not apply if either: (a) "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought," 5 U.S.C. § 702; or (b) some "other adequate remedy in a court" is available, *id.* § 704.  The Tucker Act is such a statute that allows for suit and "impliedly forbids" the use of the APA immunity waiver to litigate a contract claim.  *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 618–19 (D.C. Cir. 2017).

In short, plaintiff's APA claim against defendants cannot go forward if the claim is deemed to be covered by the Tucker Act.

### B.    The Tucker Act Covers Plaintiff's APA Claim

Neither party disputes the basic contention that the Tucker Act excises a particular type of claim from district courts' jurisdiction and situates it solely in the CFC.  *See* Defs.' Opp'n at 9 ("contract-based claims in excess of $10,000 against the federal government"); Pl.'s Opp'n

---

[8]     In contrast, "[t]he district courts and the Court of Federal Claims generally share jurisdiction over Little Tucker Act claims, *i.e.*, those not exceeding $10,000." *Palacios v. Spencer*, 906 F.3d 124, 127 n.2 (D.C. Cir. 2018) (citing 28 U.S.C. § 1346(a)(2)).

Defs.' Mot. Dismiss and Reply Supp. Mot. Prelim. Inj. ("Pl.'s Opp'n") at 3–4, ECF No. 17 (similar).  Furthermore, the parties agree that at least one specific type of claim falls under the aegis of the Tucker Act and therefore into CFC jurisdiction: namely, a breach of contract claim by plaintiff against USTRANSCOM seeking money damages for past underpayments.  Indeed, plaintiff brought this very claim in its original and amended complaints at the CFC.  *See* CFC Compl. ¶¶ 53–55; CFC Am. Compl. ¶¶ 90–97.  For its part, while the government, in its motion to dismiss plaintiff's original complaint at the CFC, argued on the merits that as a matter of law, USTRANSCOM was not in breach, *see* CFC Mot. Dismiss 7–9, it notably did not raise a *jurisdictional* objection, nor did it challenge the premise that the Tucker Act conferred jurisdiction over that claim on the CFC.

Where the parties diverge is with respect to the extent to which "the source of the rights" on which the claims are founded, and "the type of relief sought (or appropriate)," *A & S Council Oil Co. v. Lader*, 56 F.3d 234, 240 (D.C. Cir. 1995) (citation omitted), should be examined to determine if the Tucker Act applies to a claim that is not, on its face, expressed as a breach of contract claim seeking money damages.  In plaintiff's view, for the Tucker Act to preclude jurisdiction in this Court, GSA must "show that the Court of Federal Claims would have jurisdiction over *the complaint*."  Pl.'s Opp'n at 4 (emphasis added).  Plaintiff then explains why its complaint, as pleaded, could not be brought at the CFC.  Count I alleges, against GSA, that GSA lacks authority under the statute and by the terms of the Contract to perform audits and issue NOCs at all, or at least that GSA lacks authority to issue NOCs that contravene the interpretations and decisions of the Contracting Officer at USTRANSCOM.  *See* Compl. ¶¶ 109–26.  Instead of seeking damages, plaintiff seeks equitable relief to stop GSA from proceeding similarly in the future.  Compl. at 18 (Prayer for Relief).  Plaintiff cannot "seek a contractual

remedy against GSA in the Court of Federal Claims under the Tucker Act because GSA is not a

party to the contract."  Pl.'s Opp'n at 6.  As a result, in plaintiff's view, the Tucker Act does not

deprive this Court of jurisdiction.  *Id.* at 5.

Plaintiff reasons that the Court should "generally limit [its inquiry] to the four corners of

the complaint" when assessing whether the Tucker Act precludes the exercise of jurisdiction.

Pl.'s Opp'n at 10 (alteration in original) (quoting *Smalls v. United States*, 471 F.3d 186, 190

(D.C. Cir. 2006)).  Describing the complaint as not "explicitly or 'in essence' seek[ing] more

than $10,000 in monetary relief," plaintiff maintains that this Circuit's "bright line approach" to

defining the scope of the Tucker Act should cause the instant complaint to escape the Act's

reach.  *Id.* (quoting *Smalls*, 471 F.3d at 189–90).  As to what it means for a complaint to "in

essence" seek monetary relief, plaintiff recites a standard invoked in several binding Circuit

cases: "[a] complaint is not in essence one for monetary damages if the only remedy requested is

non-monetary relief that has considerable value independent of any future potential for monetary

relief."  *Id.* (internal quotation marks omitted) (quoting *Smalls*, 471 F.3d at 190); *see also Tootle

v. Sec'y of Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *Kidwell v. Dep't of Army, Bd. for Corr. of

Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995).

Plaintiff may be correct that *this* claim, as framed and pleaded in *this* complaint, against

*this* defendant, seeking *this* remedy, does not fit nicely into the criteria for CFC jurisdiction

under the Tucker Act.  There is no contract between plaintiff and GSA, and thus there is nothing

for GSA to "breach."  Furthermore, plaintiff seeks no money damages at all (let alone a sum

above $10,000).[9]  Plaintiff asserts that even if, for the sake of argument, compensation were its

---

[9]      Plaintiff entertains, at least in the hypothetical, the possibility that the claim against GSA as written could
be cognizable in the CFC if its requests for equitable relief were characterized as seeking money damages.  *See* Pl.'s
Opp'n at 15–21.  Even in that scenario where CFC has jurisdiction, plaintiff insists, the CFC's jurisdiction would
not be exclusive because "[the claim against GSA] is not founded upon a contract."  *Id.* at 15.

"ultimate goal," and even if success in its quest for equitable relief at this Court "would ultimately result in the transfer of funds from the government to the plaintiff," that result is still not dispositive of the jurisdictional question.  Pl.'s Opp'n at 10–11.  In support, plaintiff argues that the requested equitable relief aims to arrest harms going beyond merely the partial nonpayment of its invoices, such as "time and resources spent investigating and challenging invalid audit conclusions," "degrading [its] performance" on the Contract by "[k]eeping personnel from normal contract performance," and exposure to "two dispute resolution processes."  *Id.* at 12–13.

GSA, on the other hand, argues that the Tucker Act does apply by viewing the situation more holistically: "the claims in Plaintiff's complaint derive from or arise from the contract between Crowley and USTRANSCOM or, otherwise stated, Plaintiff's claim is *contractual in origin*."  Defs.' Reply at 3 (emphasis added).  GSA also views the requested relief in consequentialist terms: "the underlying implication of the relief in the complaint seeks the protection of a right to money that is secured by contract."  *Id.*  Emphasizing that the genesis of *any* right plaintiff may have to payment is the Contract, GSA suggests that any detriment to plaintiff from GSA's actions is, if actionable at all, only meaningful in the context of those payment rights derived from contract.  *See* Defs.' Opp'n at 11–12.  Even though in this complaint plaintiff nominally seeks only declaratory and injunctive relief, GSA argues that such claims, too, "originate under and are governed by the [Contract], in which NOCs were issued and offsets are applied because that contract is the source of plaintiff's alleged right to payment and any other relief."  *Id.* at 14.  Thus, GSA urges the Court to reject plaintiff's "attempt to plead around" the Tucker Act "jurisdictional problem," *id.* at 12, invoking the rule against plaintiffs "bypass[ing] Tucker Act jurisdiction by converting complaints which 'at their essence' seek

money damages from the government into complaints requesting injunctive relief or declaratory actions," *id.* at 12–13 (quoting *Kidwell*, 56 F.3d at 284).

### 1. *The* Kidwell *Test Is Controlling*

The D.C. Circuit's opinion in *Kidwell v. Department of Army, Board for Correction of Military Records*, 56 F.3d 279, is instructive—and cited by both parties.  In *Kidwell*, a veteran filed an APA claim in the district court seeking a change in his military files to indicate that his discharge was "medical" in nature.  *Id.* at 281.  "Although Kidwell did not explicitly request monetary relief in his complaint, the government claimed that a district court order" requiring recharacterization of his discharge "would entitle Kidwell to retroactive disability benefits that could exceed $50,000."  *Id.* at 283.  In the government's view, this gave exclusive jurisdiction over the suit to the CFC under the Tucker Act.  *Id.*  On appeal from the district court's grant of dismissal for lack of jurisdiction, the Circuit recognized that although the complaint did not expressly seek monetary relief, "[t]he plain language of a complaint . . . does not necessarily settle the question of Tucker Act jurisdiction."  *Id.* at 283–84.  The court observed that when a plaintiff seeks to evade the Tucker Act by creatively avoiding pleading a request for money damages, "this forum shopping circumvents a primary purpose of the Act—to ensure that a central judicial body adjudicates most claims against the United States Treasury."  *Id.* at 284.

The court confirmed that a claim falls under the Tucker Act if it "explicitly or 'in essence' seeks more than $10,000 in monetary relief."  *Id.*  It cautioned, however, that merely "hint[ing] at some interest in a monetary reward" or the fact that "success on the merits may obligate the United States to pay" does not, alone, mean a plaintiff "in essence" seeks monetary relief.  *Id.*  The critical test, according to the Circuit, is whether the "complaint only requests non-monetary relief that has 'considerable value' independent of any future potential for

monetary relief—that is, as long as the sole remedy requested is declaratory or injunctive relief that is not 'negligible in comparison' with the potential monetary recovery." *Id.* (citations omitted). If so, the complaint may proceed in district court. *Id.* As to the *Kidwell* case itself, the Circuit recognized that while "monetary benefits . . . may flow from Kidwell's victory," the relief would also confer non-monetary benefits by "lift[ing] some of the shame associated with failing to receive an honorable discharge." *Id.* at 285. The court viewed the equitable relief as "not 'negligible in comparison'" to eventual monetary benefits and held that the district court did have jurisdiction to hear the complaint. *Id.* at 286.[10]

The *Kidwell* test favors GSA here. Although the parties differ on the precise effects of an order granting plaintiff's requested equitable relief against GSA, it is difficult to see how the requested "[j]udgment declaring that GSA is not authorized to audit the contract" and "that GSA's NOCs violate the finality of the Contracting Officer's final decisions," Compl. at 18 (Prayer for Relief), would not effect the release of the offsets assessed by GSA to date and prevent more such offsets from issuing. Indeed, GSA posits that such an order would have that result. *See* Defs.' Opp'n at 14 ("Plaintiff wants to . . . seek reimbursement of the monies already offset."). Ironically, plaintiff strenuously argues that this is not the result sought *in this action* and that "[e]ven if granting Crowley's requested relief would prevent GSA from offsetting further funds, this would not demonstrate that Count I is contractual." Pl.'s Opp'n at 20–21. Instead, plaintiff insists that it "seeks to enjoin GSA's statutory violations that subject it to irreparable harm—including the resources necessary to address GSA's myriad unlawful audits." *Id.* at 21.

---

[10] Although *Kidwell* reversed the decision below dismissing for lack of jurisdiction, the district court had also made an alternative grant of summary judgment for the government, which the Circuit affirmed. 56 F.3d at 287.

Plaintiff faults GSA for not reciting and faithfully applying *Kidwell*'s "considerable value" test.  Pl.'s Opp'n at 13.  Applying that test, however, does not help plaintiff's cause.  In plaintiff's framing, the primary harm that would be addressed by the relief requested in this Court is the accrual of expense associated with "investigating and challenging" the audits, "an expense which [as of September 24, 2021] exceeds $187,000 and cannot be recovered."  Pl.'s Opp'n at 12–13.  While that expense is not insignificant and indeed would not be compensated by any money damage award either here or at the CFC, these "investigat[ions] and challeng[es]" concern "more than fifty thousand individual Notices of Overcharges . . . totaling approximately $37 million and counting."  Pl.'s Mem. Supp. Mot. Prelim. Inj. ("Pl.'s Mem.") at 1, ECF No. 9-1.  *That* is the real amount at stake here, and plaintiff's own figures show that it dwarfs the harm ostensibly motivating this complaint by a factor of roughly 200-to-1.[11]  Under these facts, the relief sought here is indeed "negligible in comparison" to the uncollected contractual proceeds at issue.

### 2.     *Other Case Law*

Aside from *Kidwell*, the parties invoke dueling suites of Circuit precedent in their attempts to divine the dividing line between permissible and impermissible district court equitable claims in light of the Tucker Act's jurisdictional restrictions.[12]  None changes the conclusions reached above.

Plaintiff cites *Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982), in which the Circuit held that district court jurisdiction could lie for a claim against the government for

---

[11]     These two figures appear in papers filed 23 days apart and as such may not perfectly correspond to each other.  That said, the magnitude of the difference between the value of the equitable relief and the potential contract relief is sufficiently great that any minor temporal misalignment is of minimal, if any, significance.

[12]     The briefs are replete with citations to decisions from other Judges on this Court, but since binding Circuit authorities provide sufficient guidance, those district court cases will not be discussed here.

"alleged governmental infringement of property rights and violation of the Trade Secrets Act," *id.* at 969, where the intellectual property at issue was disclosed to the government during performance of various contracts, *id.* at 964.  *See* Pl.'s Mem. at 13–14.  The Circuit rejected the idea that "any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act."  *Megapulse*, 672 F.2d at 967–68.  The court particularly noted that the infringement claims were not an attempt to enforce a contract and, to the extent the case was contract related at all, it was only because the government attempted to use the contract as a *defense* by showing it provided for lawful possession of the property.  *Id.* at 969.  While articulating some limits on the Tucker Act, *Megapulse* does not help plaintiff.  Here, even though plaintiff tries to frame GSA's audits as an independent wrong and violation of statute, the audits have no significance outside the context of collection on the contract and no other exogenous harm (such as improper disclosures of trade secrets) is alleged.

Plaintiff's other D.C. Circuit cases are similarly unhelpful.  *See* Pl.'s Opp'n at 10–14; Pl.'s Mem. at 12–16.  In *Tootle v. Secretary of the Navy*, 446 F.3d 167, the Circuit held that the district court had jurisdiction to hear a claim "materially indistinguishable from" that in *Kidwell*, *id.* at 174, observing that a medical determination finding making a servicemember eligible for retirement (even if possibly eventually accompanied by some retroactive monetary benefit) "itself has non-negligible value, especially for an ill serviceman," *id.* at 175.  *See also Smalls*, 471 F.3d 186 (similar).  In *Vietnam Veterans of America v. Secretary of the Navy*, 843 F.2d 528 (D.C. Cir. 1988), the court expressly noted that at that time the Circuit had *not* "settle[d] the issue of splitting equitable and monetary claims, in either Tucker Act context"—precisely what plaintiff is now doing—and did not need to address it then either.  *Id.* at 535.  *Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989) involved rights arising from participation in a grant program and

not on "an agreement negotiated by the parties," *id.* at 978 n.13 (citation omitted).  In *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791 (Fed. Cir. 1993), the monetary claim did not exceed $10,000, so there was no question of district court jurisdiction under the Little Tucker Act, *see id.* at 794, 797.  These cases are only useful to plaintiff to support the proposition that the possibility (or even certainty) of monetary relief arising as a result of a successful claim does not *per se* preclude the district court from hearing a related equitable claim.  Yet, that is a different question from the key question here: whether the specific dispute here is "in essence" a contract claim.

GSA's appeals to authority are more apposite.  *See* Defs.' Opp'n at 12–15.  Most notably, in *Spectrum Leasing Corp. v. United States*, 764 F.2d 891 (D.C. Cir 1985), a contractor providing software and hardware services to GSA (who, unlike here, was a party to the contract) challenged GSA's withholding of payments on certain hardware invoices on account of liquidated damages assessed against the plaintiff due to failures to fulfill software-related obligations, *id.* at 892.  The contractor sued in district court not for money damages *per se*, but for violations of the Debt Collection Act of 1982, a statute that "provides a set of procedures and safeguards designed to assure due process protections to delinquent government debtors."  *Id.* at 892 n.1.  The Circuit held that "the contract provides the ultimate source of [plaintiff's] rights" and as such the claim was subject to the jurisdictional provisions of the Tucker Act.  *Id.* at 895.[13] As GSA explains, this case is analogous.  *See* Defs.' Opp'n at 14.  Plaintiff's alleged rights to certain monies "originate under and are governed by the [C]ontract."  *Id.*  As in *Spectrum Leasing*, plaintiffs allege government noncompliance with other statutory strictures relevant to

---

[13] At the time, the Court of Federal Claims was named the "United States Claims Court." *See* Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 902(a), 106 Stat. 4506, 4516 (changing name to Court of Federal Claims).

contract and payment administration.  The result is a claim that "at [its] essence seek[s] to recover money from the government"—one that can be brought only under the Tucker Act and not under the APA.  *Id.*

*   *   *

All told, plaintiff's situation is understandably difficult and frustrating, but the fundamental grievance underlying plaintiff's cases before both the CFC and this Court is that it furnishes transportation-related services to the government pursuant to the Contract and does not get paid the full amount it believes it is due.  But for that issue, neither complaint would exist, and leads inexorably to the conclusion that the dispute "arises from" a contract—the Contract— with the government.  In these two companion cases, plaintiff articulately deconstructs its grievance into two constituent parts: (1) funds reflecting the full invoice totals are not delivered to plaintiff, a matter plaintiff pursues as a breach of contract action at the CFC; and (2) GSA's allegedly erroneous and unlawful invoice audits cause not only the diversion of funds properly destined for plaintiff but also undue administrative hassle and expense incurred in disputing the results of those audits.  In one sense, plaintiff is correct that two potentially problematic actions (or inactions) are occurring here, and distinct actors take those two actions: aberrant auditing on the one hand, and nonpayment on the other.  As a practical matter, however, GSA's audits are merely part of the mechanism (albeit a very important part) by which the nonpayments arise, and *neither* issue would exist were it not for certain rights to payment promised in the Contract.

Simply put, it strains credulity to insist that "[t]he actual terms of the contract and Crowley's right to payment are irrelevant" to "the narrow issue of GSA's auditing of Crowley's invoices beyond GSA's authority . . . in a manner that directly contradicts the final decisions of the Contracting Officer."  Pl.'s Mem. at 12–13.  The Court declines plaintiff's invitation to

22

compartmentalize these matters in such an unintuitive fashion.  Under controlling Circuit precedent, the declaratory and injunctive relief claims advanced by plaintiff here fall under the umbrella of the Tucker Act.  As such, the APA's sovereign immunity waiver does not apply, and the Court lacks jurisdiction to entertain this claim.

## C.      Plaintiff's *Ultra Vires* Claim Fails

Plaintiff argues that even if, as the Court has found, the APA's sovereign immunity waiver is inapplicable due to the claim falling within the Tucker Act, "this Court may also provide relief due to GSA's *ultra vires* actions."  Pl.'s Mem. at 23; Pl.'s Opp'n at 23.  This side-door attempt to invoke the district court's jurisdiction can be easily dispatched.

To be sure, under the "so-called *Larson–Dugan* exception to the general rule" of sovereign immunity absent a waiver, "'suits for specific relief against officers of the sovereign' allegedly acting 'beyond statutory authority or unconstitutional' are not barred."  *Pollack v. Hogan*, 703 F.3d 117, 119–20 (D.C. Cir. 2012) (per curiam) (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949); and citing *Dugan v. Rank*, 372 U.S. 609, 621–22 (1963)).[14]  "The exception is based on the principle that such *ultra vires* action by a federal officer 'is beyond the officer's powers and is, therefore, not the conduct of the sovereign.'"  *Id.* at 120 (quoting *Larson*, 337 U.S. at 690).  Put another way, "courts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'"  *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 681 (1986)).

---

[14]      The *Larson–Dugan* exception only holds for named officers and thus plaintiff's *ultra vires* theory could at most sustain jurisdiction against the GSA Administrator, not GSA itself.

This type of exception, like plaintiff's argument, carries significant normative appeal, as seemingly an important source of assurance that executive agencies and officers are not "above the law."  That said, plaintiff provides no case law examples of courts allowing, or even considering, *ultra vires* theories of statutory violations as a way to escape the jurisdictional strictures imposed by the *Tucker Act*—and the Court has found none.[15]  As such, allowing jurisdiction on this theory appears to be unprecedented, and this case will not open this door.

Perhaps not surprisingly, this theory does not tend to arise in this context.  For one thing, the Tucker Act is not fundamentally a limitation on reviewability of government actions; rather, it is a jurisdiction-steering provision.  Requiring review to be sought first at the CFC (with appeal to an Article III court available) is quite different in character from precluding judicial review altogether.  Furthermore, this theory admits of no limiting principle and likely would create a gaping exception that would risk swallowing the Tucker Act jurisdictional rule.  Given the number and complexity of statutes governing interactions between agencies and contractors, nearly *any* government contract dispute might also incidentally implicate *some* statutory provision and create a basis for jurisdiction at a district court alongside the CFC.  Such a result would plainly frustrate the Tucker Act's objective of "ensur[ing] that a central judicial body adjudicates most claims against the United States Treasury."  *Kidwell*, 56 F.3d at 284.

---

[15]     The CFC and the Federal Circuit have occasionally confronted a related issue: whether *ultra vires* actions by a federal official can be the basis for a Tucker Act takings claim brought in the CFC.  *See, e.g.*, *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362–63 (Fed. Cir. 1998).  The general rule appears to be that where the official is definitively acting outside the scope of his or her duties, a Tucker Act claim will not lie.  *See id.* This does not mean, however, that an unlawful act is necessarily an "*ultra vires*" act outside the reach of the Tucker Act.  "In holding that *ultra vires* conduct cannot give rise to a Fifth Amendment taking, the courts have drawn an important distinction between conduct that is 'unauthorized' and conduct that is authorized but nonetheless unlawful.  Merely because a government agent's conduct is unlawful does not mean that it is unauthorized; a government official may act within his authority even if his conduct is later determined to have been contrary to law."  *Id.* at 1362.  Analogizing to plaintiff's *ultra vires* argument, the type of GSA audit conduct alleged in the complaint seems to be in the category of potentially erroneous conduct that is nevertheless within the general scope of authority of GSA officials.

*   *   *

Plaintiff's allegations, taken as true, weave a rather Kafkaesque tale.  Regardless of the correct substantive answer about the meaning of the Contract and how the ensuing invoices should be calculated—matters on which this Court cannot and does not opine due to its jurisdictional ruling today—the apparent inability of the government to agree with itself and to implement a consistent decision on interpretation of the Contract is hardly a model of efficiency. The government has expressly represented here that "Plaintiff does indeed not lack an adequate remedy in another Court"—the Court of Federal Claims—and has in essence laid out a blueprint for how this matter can receive a fulsome hearing there.  *See* Defs.' Opp'n at 15–18.  Plaintiff's case before that tribunal appears poised to continue even as this case here ends today.  Hopefully, the government will maintain a litigation position there consistent with its representations here, allowing the parties to this Contract to achieve a common understanding of their commercial terms rather than remaining stuck in an infinite loop of audits, disputes, and payments held in limbo.

## IV.   CONCLUSION

For the foregoing reasons, this Court lacks jurisdiction to hear plaintiff's action, jurisdiction for which is conferred exclusively by statute to the Court of Federal Claims. Accordingly, defendants' motion to dismiss for lack of jurisdiction is **GRANTED** and plaintiff's motion for preliminary injunction must be **DENIED AS MOOT**.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  October 22, 2021

_____
BERYL A. HOWELL
Chief Judge