**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CROWLEY GOVERNMENT SERVICES, INC., | |
| Plaintiff, | Civil Action No. 21-cv-2298 (BAH) |
| v. | Judge Beryl A. Howell |
| GENERAL SERVICES ADMINISTRATION, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

Plaintiff Crowley Government Services, Inc. ("Crowley"), initiated this action nearly two years ago, invoking the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, and seeking equitable relief to stop the General Services Administration and its Administrator (collectively, "GSA" or "defendants") from a years-long practice of interfering with payments due Crowley pursuant to a contract with the U.S. Transportation Command ("USTRANSCOM"), a component of the U.S. Department of Defense ("DoD"). *See* Compl. ¶¶ 1–3, 108–37, ECF No. 1. Following remand by the D.C. Circuit, which reversed this Court's dismissal of the complaint for lack of subject matter jurisdiction, *see Crowley Gov't Servs., Inc. v. Gen. Servs. Admin. ("Crowley II")*, 38 F.4th 1099, 1106 (D.C. Cir. 2022), Crowley asked that the Court "consolidate its preliminary injunction motion with a determination of the merits, schedule a speedy hearing on this motion as soon as possible, and enter judgment" on the merits. Pl.'s Mot. Speedy Decl. J. Hr'g ("Pl.'s Mot. Decl. J.") at 2, ECF No. 31; *see also* Pl.'s Mem. Supp. Mot. Speedy Decl. J. Hr'g ("Pl.'s Mem. Decl. J."), ECF No. 31. Defendants countered by moving for partial judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), and opposed Crowley's motion. Defs.' Mot. Partial J. on Pleadings & Opp'n Pl.'s Mot. Speedy Decl.

Hr'g ("Defs.' Mot. Partial J."), ECF No. 42; Defs.' Mem. Supp. Partial Mot. J. on Pleadings & Opp'n Pl.'s Mot. Speedy Decl. Hr'g ("Defs.' Mem. Partial J."), ECF No. 42.[1]  Following extensive supplemental briefing at the Court's direction, *see* Minute Order (Jan. 19, 2023), and a stay to permit the parties time to seek mediation, defendants filed a Motion to Dismiss, ECF No. 70, arguing the case is now moot in light of GSA's commitment to cease auditing Crowley's current contracts with USTRANSCOM.

Crowley has waged a two-pronged campaign to restore the payments claimed due under its contract with USTRANSCOM, with litigation in the U.S. Court of Federal Claims ("USCFC") alleging USTRANSCOM breached its contract with Crowley by failing to ensure the contractor received full payment for its services, and the instant litigation in this Court challenging GSA's authority both to conduct any audits of the contract and to control the outcome of any dispute arising from GSA's audits of Crowley's compliance with the contract. *See Crowley II*, 38 F.4th at 1104.  As this Court originally pointed out, GSA is caught between two agencies that cannot agree on the outcome of Crowley's dispute with GSA's audits, *see Crowley Gov't Servs., Inc. v. Gen. Servs. Admin. ("Crowley I")*, Case No. 21-cv-2298 (BAH), 2021 WL 4940953, at *12 (D.D.C. Oct. 22, 2021)—a bureaucratic nightmare amounting to more than $40 million in withheld payments to Crowley that presents a cautionary tale for all government contractors providing similar transportation services.  Although GSA finally

---

[1] The memoranda filed in support of many of the parties' motions are docketed twice and, to simplify citation, only one of the duplicate memoranda will be cited.  For example, the consolidated memorandum in support of defendants' first Motion to Dismiss and their opposition to Crowley's Motion for Preliminary Injunction is docketed twice, once at ECF No. 13 and once at ECF No. 14; only the memorandum at ECF No. 13 is cited. Crowley's consolidated memorandum in opposition to defendants' first Motion to Dismiss and reply in support of its Motion for Preliminary Injunction is docketed at ECF No. 17 and ECF No. 18; only the memorandum at ECF No. 17 is cited.  Defendants' consolidated memorandum in support of their Partial Motion for Judgment and their opposition to plaintiff's Motion for Speedy Declaratory Judgment Hearing is docketed at ECF No. 42 and ECF No. 43; only the memorandum at ECF No. 42 is cited.  Crowley's consolidated memorandum in opposition to defendants' Motion for Partial Judgment and reply in support of its Motion for Speedy Declaratory Judgment Hearing is docketed at ECF No. 44 and ECF No. 45; only the memorandum at ECF No. 44 is cited.

caved—after two long years of litigation and hundreds of pages of legal briefing—refunding nearly $30 million to Crowley, that agency cannot dodge judicial review of its power-grab so easily.

This case boils down to two questions: Is GSA authorized to audit Crowley's contract with USTRANSCOM, pursuant to the Transportation Act of 1940, 31 U.S.C. § 3726(b), as GSA urges?  If so, but GSA's audit determinations are disputed by Crowley, what statutory dispute resolution scheme applies?  For the reasons set forth below, the answer to the first question is yes, and the answer to the second question is that the procedures set forth in the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 7101 *et seq.*, apply because there is no dispute between Crowley and USTRANSCOM, channeling Crowley's challenges to any resulting adverse audit determinations by GSA to a USTRANSCOM Contracting Officer, not GSA's more onerous administrative appeals process.  Accordingly, for the reasons explained herein, Crowley's motion for speedy declaratory judgment is denied in part and granted in part, defendant's motion for partial judgment is granted, and defendants' motion to dismiss is denied.

## I.   BACKGROUND

### A.   Factual Background

On November 22, 2016, Crowley and USTRANSCOM entered a contract ("DFTS Contract"), as a part of the latter's "Defense Freight Transportation Services" program, engaging Crowley in planning and managing transportation services for DoD cargo within the continental United States.  Compl. ¶¶ 19–21, 30–32; AR Part I at GSA_000013–42, ECF No. 50-3.[2]

---

[2]     The Administrative Record ("AR") in this case is voluminous, spanning over 1600 pages, and was docketed in three separate attachments. *See* ECF Nos. 50-3 (Part I), 50-4 (Part III), 54-1 (Part II).  For clarity, "AR" citations herein refer to documents by their Bates-stamped pagination.  The Director of GSA's Transportation Audits Division certified that the docketed index of the administrative record was a "complete copy of the non-privileged documents that were directly or indirectly considered in connection with the GSA's issuance of Notices of Overcharge related to Crowley Government Services, Inc.'s transportation bills."  Certification of Administrative Record Index, ECF No. 50-1.

USTRANSCOM awarded Crowley the DFTS Contract under the Federal Acquisition Regulation (FAR), 48 C.F.R. § 1.000 *et seq.*, which implements statutory provisions authorizing executive agencies, including DoD, to procure goods and services.  *See* Compl. ¶ 22; Defs.' Answer ¶ 22, ECF No. 41.  Under the DFTS Contract, Crowley serves as an implementer and coordinator of shipments and subcontracts to third parties, which perform the actual movement of the shipments.  In this role, Crowley receives shipping orders from government shippers specifying the origin, destination, and other attributes of desired cargo shipments within the continental United States, and then plans and coordinates the transportation of the shipments from end to end—selecting, scheduling, and paying various types of subcontractors to perform the actual handling and movement of the cargo.  Compl. ¶¶ 30–32, 34–35. The DFTS Contract sets forth certain performance standards for delivery timeframes and allowable reasons for deviations from those standards (e.g., inclement weather), *id.* ¶¶ 36–37, as well as certain conventions for the computation of shipping timeframes (e.g., the treatment of weekends and holidays), *id.* ¶¶ 38–39. By August 30, 2021, Crowley had planned and managed approximately 1.2 million shipments under the DFTS Contract.  *Id.* ¶ 33.

The instant conflict arose when GSA began auditing Crowley's performance under the DFTS Contract and assessing Notices of Overcharge (NOCs) against plaintiff.  GSA is not a party to the contract, but asserted authority to conduct post-payment audits of Crowley's invoices under the Transportation Act, which authorizes the agency to "conduct pre- or post-payment

---

Notwithstanding GSA's certification, Crowley disputes the completeness of the AR, arguing that GSA improperly omitted documents revealing the negotiations between USTRANSCOM and GSA to create a Memorandum of Agreement governing the DFTS Contract, which negotiations ultimately fell apart over GSA's insistence on authority to override a USTRANSCOM Contracting Officer's final decision.  *See* Pl.'s Resp. Defs.' Answers to Ct.'s Jan. 19, 2023 Min. Order (Questions 3 & 4) ("Pls.' Opp'n Defs.' 1st Resp. Min. Order") at 18–23, ECF No. 53.  Many of the communications Crowley cites as belonging in the AR, however, were apparently obtained through discovery in the USCFC matter and were created after GSA issued many of the NOCs at issue in this case.  Regardless, in complaining about the AR, Crowley merely "reserve[d] its right to move to complete or supplement the AR if this case is not resolved through mediation"—which motion was never filed.  *Id.* at 27.

audits of transportation bills of any Federal agency." 31 U.S.C. § 3726(b). GSA does not conduct such audits itself, but contracts with non-governmental third-party vendors to perform this auditing function. In the case of Crowley's DFTS Contract, a vendor called The Commercial Traffic Company, based in Cleveland, Ohio, was responsible for conducting GSA's post-payment audits. *See* Defs.' Reply Supp. Mot. Dismiss, Ex. A to Decl. of GSA Assistant Comm'r Crystal Philcox, Letter from Katherine Cartoski, GSA Contracting Officer, to Allan Miner, President, Commercial Traffic Company (April 27, 2023), ECF No. 73. GSA's scrutiny or double-checking of such third-party audits against the actual terms of the contract is unclear from the record, but GSA proceeds to issue NOCs based on these third-party audits to transportation service providers, declaring that the contractors owe debts to the agencies with which they contract based on overcharges identified in the audit.

Between 2018 and the date Crowley initiated this lawsuit in August 2021, GSA issued 50,593 NOCs to Crowley. Each NOC demanded payment for overcharges in small amounts, often less than $1,000, but altogether, the NOCs sought approximately $37 million in alleged overcharges. Compl. ¶ 72; Defs.' Answer ¶ 72; AR Part I at GSA_000155–399. To recoup the NOC-related overcharges, GSA seized "millions of dollars of contract payments before they reach[ed] Crowley" by applying set-offs to Crowley's subsequent payments. Pl.'s Mem. Decl. J. at 2. The NOCs arose from GSA's disagreements with Crowley's invoices regarding the interpretation of the DFTS Contract across a range of categories, including the applicability of allowed exceptions to expected delivery timelines, Compl. ¶ 43, the method of counting days when measuring actual delivery performance, *id.* ¶¶ 45–46, and issues stemming from alleged errors in government paperwork or limitations in government booking systems, *id.* ¶¶ 47–52.

Crowley challenged a subset of these NOCs across each category with a USTRANSCOM Contracting Officer, employing the complaint process provided in the disputes clause incorporated by reference in the DFTS Contract.  Compl. ¶¶ 26–27, 54; AR Part I at GSA_000024.  Between August and December 2020, the Contracting Officer issued three Final Decisions, concluding with respect to each category of GSA's challenged NOCs that "[they] should not have been issued" and were "erroneous."  AR Part I at GSA_000010; *see also id.* at GSA_000001–12.  GSA's primary error, according to the Contracting Officer, was failing to apply the terms of the DFTS Contract.  For example, GSA counted holidays, weekends, and the pick-up day as part of shipment transfer time, contrary to the DFTS Contract's stated terms*.  Id.* at GSA_000009.  These Final Decisions disagreeing with the basis of GSA's NOCs invoked a 2016 Memorandum of Agreement between USTRANSCOM and GSA ("2016 MOA").  Though this MOA's text describes it as only a tentative "baseline used to construct a gap analysis for a proposed future To-Be state," AR Part II at GSA_000417–26, the MOA also expressly states that the Contracting Officer has the authority to "render final decision and/or authority on protests and claim[s] to GSA."  AR Part I at GSA_000001, 000003; AR Part II at GSA_000421.  Notwithstanding this express Agreement constraining GSA's final decision-making authority, the Contracting Officer stated that USTRANSCOM lacked the authority to order GSA to refund Crowley's seized payments, and directed Crowley to seek recovery of the funds through the "GSA Post-Payment Audit dispute process," citing 41 C.F.R. § 102-118.600, *et seq*.  *Id.* at GSA_000010–11.

Having staked their positions, USTRANSCOM and GSA dug in their heels into a protracted tug of war, with Crowley in the middle.  GSA continued issuing NOCs after the Contracting Officer's Final Decisions issued, and off-setting those amounts against Crowley's

contract payments.  *See* Compl. ¶¶ 70–73; Defs.' Answer ¶¶ 70, 72–73.  In a December 2020

"Situational Analysis/Info Paper," outlining discussions between GSA and USTRANSCOM

regarding Crowley, GSA Director of Transportation Audits George Thomas reportedly informed

USTRANSCOM officials that "GSA Audits does not have to abide by the contract between

[Crowley] and DoD," and casted GSA in the role of providing "a mechanism for checks and

balances."  AR Part I at GSA_000138.  Although USTRANSCOM reportedly recommended

establishing an inter-agency Memorandum of Agreement regarding DFTS—apparently to

supplement the 2016 MOA—GSA's heels were so deeply dug, this recommendation went

nowhere.  *Id.  See also* Defs.' Resp. Questions 3 & 4 of Ct.'s Jan. 19, 2023 Min. Order ("Defs.'

1st Resp. Min. Order") at 2, ECF No. 52 (identifying the 2016 MOA as the only negotiated

solution between the agencies).  Instead, Mr. Thomas internally discussed with other GSA

officials how to demonstrate that "the [Contracting Officer Final Decision] is wrong and we are

right. . . [and] why this needs to be resolved in court and GSA will win."  AR Part I at

GSA_000139.  Six months after the last Final Decision issued, in June 2021 alone, Crowley

received over 11,000 NOCs.  Compl. ¶ 73; Defs.' Answer ¶ 73.

Even as GSA and USTRANSCOM stood in deadlock over their authority to judge

Crowley's performance of the Contract, Crowley continued its performance and redirected

substantial resources and labor into reviewing GSA's blizzard of NOCs.  Crowley's Deputy

Program Manager for the Contract swore in an affidavit filed in this litigation that she spent as

many as 20 hours per week addressing NOCs issued by GSA.  Pl.'s Mot. Prelim. Inj., Shannon

Sarkees Decl. ¶ 39, ECF No. 9-13.  And the NOCs continued to add up: In the year after

Crowley filed its motion for a preliminary injunction on September 1, 2021, GSA issued another

113,000 NOCs.  Pl.'s Opp'n Defs.' Mot. Stay at 10, ECF No. 32.  By April 2023, when GSA

attempted to resolve this litigation by promising to cease auditing the DFTS Contract and to not collect on already-issued NOCs, the value of issued but not-yet-collected-upon NOCs against Crowley had grown to a staggering $83 million.  *See* Defs.' Reply Supp. Mot. Dismiss, Decl. of GSA Assistant Comm'r Crystal Philcox ("Philcox Decl.") ¶ 5, ECF No. 73-1.  In all, GSA has intercepted more than $40 million in payments from USTRANSCOM to Crowley.  Pl.'s Opp'n Defs.' Mot. Stay at 14. Interestingly, in terms of shedding some light on incentives for the federal agencies' divergent positions and GSA's resistance to engaging with DoD on an updated agreement, those payments line the GSA Transportation Audit Division's own coffers.  *See infra* n.14 (discussing 31 U.S.C. § 3726(e).

### B.     Procedural Background

#### 1.     *Crowley's Action Before the Court of Federal Claims*

On May 27, 2021, Crowley filed suit against USTRANSCOM in the USCFC for failure to pay amounts due under the DFTS Contract.  Compl. ¶ 1, *Crowley Gov't Servs., Inc. v. United States*, No. 21-cv-1405 (PEC) (Fed. Cl. May 27, 2021), ECF No. 1 ("CFC Compl.").  In one count, Crowley alleged breach of contract and sought money damages totaling $117,633.81 because "[t]he contract does not authorize the GSA to issue NOCs" and USTRANSCOM failed to provide payment compensating for the improper offsets despite agreeing with Crowley on the amounts due.  *Id.* ¶¶ 49–55.  In a second count, citing GSA's ongoing issuance of NOCs despite the Contracting Officer's disagreement with GSA, Crowley sought a declaratory judgment confirming, *inter alia*, "the GSA's lack of authority to issue setoffs." *Id.* ¶¶ 57–60.

The United States, on behalf of USTRANSCOM, moved, on August 9, 2021, to dismiss the complaint pending before the USCFC, arguing that "[a]s currently constructed, Crowley's complaint must be dismissed pursuant to [USCFC Rule] 12(b)(6) for failure to state a claim upon which relief can be granted."  Def.'s Mot. Dismiss at 1–2, *Crowley*, No. 21-cv-1405 (Fed. Cl.

Aug. 9, 2021), ECF No. 7 ("CFC Mot. Dismiss").  USTRANSCOM characterized Crowley's

demand for declaratory relief as a "blanket attack on the Transportation Act," providing in

relevant part that "[the GSA] Administrator may conduct pre- or post-payment audits of

transportation bills of any Federal agency," *id.* at 5 (quoting 31 U.S.C. § 3726(b)), which is

precisely what GSA did.  Furthermore, in the DFTS Contract itself, Crowley "expressly agreed

to 'support Government agency reviews and audits of all services.'"  *Id.* at 5.  With respect to the

breach of contract claim, USTRANSCOM reiterated that the Contract allowed for GSA audits,

and in any event USTRANSCOM did deposit the full invoiced amounts to the bank and had no

statutory authority to issue a duplicate payment in response to GSA's offsets.  *Id.* at 7–8.

Finally, while concluding that "no contractual cause of action exists here," USTRANSCOM

urged that "Crowley is not without recourse," pointing to the Contracting Officer's explanation,

quoted in the complaint itself, of remedies available through the dispute process for GSA audits.

*Id.* at 9.

On August 26, 2021, Crowley filed an amended complaint in the USCFC docket, naming

both USTRANSCOM and GSA as defendants.  First Am. Compl. ¶¶ 16–17, *Crowley*, No. 21-cv-

1405 (Fed. Cl. Aug. 26, 2021), ECF No. 8 ("CFC Am. Compl.").  The first count reiterated the

breach of contract claim against USTRANSCOM for nonpayment, *id.* ¶¶ 90–97, including

detailed allegations regarding how any inter-agency disputes or perceived limitations on

USTRANSCOM's authority to pay are issues to be worked out by USTRANSCOM, not by

Crowley, *see id.* ¶¶ 56–67.  Crowley no longer sought declaratory relief against

USTRANSCOM, but added a second count arguing, in the alternative, that even if GSA had

statutory authority to conduct post-payment audits and offsets, the GSA-issued NOCs were

unlawful as they were based on an "incorrect interpretation of the contract."  *Id.* ¶¶ 99–102.

Crowley's alternative count included a demand for an additional $11,880,997.99, reflecting additional NOCs which GSA had issued but were pending review by the USTRANSCOM Contracting Officer. *Id.* ¶¶ 13, 101.

On August 30, 2021, the USCFC denied the motion to dismiss as moot because the complaint had by that point been amended, and directed the government to answer or respond by September 20, 2021. Order, *Crowley*, No. 21-cv-1405 (Fed. Cl. Aug. 30, 2021), ECF No. 10. The government filed its answer accordingly, and the parties commenced discovery pursuant to the USCFC's preliminary scheduling order.  *See* Def.'s Answer, *Crowley*, No. 21-cv-1405 (Fed. Cl. Sept. 20, 2021), ECF No. 12; Preliminary Scheduling Order, *Crowley*, No. 21-cv-1405 (Fed. Cl. Nov. 10, 2021), ECF No. 14.  Despite the USCFC's admonition that "no dispositive motions . . . may be filed prior to the [January 17, 2023] scheduled status report" at the end of discovery, *id.* at 1 n.1, the United States prematurely filed a motion for partial summary judgment, to which Crowley responded with a cross-motion for partial summary judgment.  Def.'s Mot. Partial Summ. J., *Crowley*, No. 21-cv-1405 (Fed. Cl. Feb. 3, 2022), ECF No. 15; Pl.'s Cross-Mot. Partial Summ. J., *Crowley*, No. 21-cv-1405 (Fed. Cl. March 17, 2022), ECF No 23.  These summary judgment-related briefs were struck from the record because the motions were filed before the completion of discovery.  Order, *Crowley*, No. 21-cv-1405 (Fed. Cl. July 12, 2022), ECF No. 49.

On September 30, 2022, the parties jointly moved for a stay of the proceedings before the USCFC, noting that the parties were engaged in discussions to resolve their dispute outside of litigation, and further noting that the parallel litigation before this Court may resolve legal questions related to GSA's audit authority before the lifting of the stay.  Consent Mot. for Temporary Stay, *Crowley,* No. 21-cv-1405 (Fed. Cl. Sept. 30, 2022), ECF No. 55.  As a part of

the stay, the parties repeatedly agreed to extend a tolling agreement, originally entered on May 31, 2022, until July 11, 2023, preventing GSA from continuing to issue NOCs or deduct payments for outstanding NOCs during the pendency of the agreement.  *Id.*; *see also* Defs.' Mot. Stay, Ex. C, Tolling Agreement, ECF No. 29-3; Joint Status Report at 2, *Crowley,* No. 21-cv-1405 (Fed. Cl. May 5, 2023), ECF No. 61.  This motion for a stay was granted, with those proceedings remaining stayed since September 30, 2022.

### 2.    *Crowley's Action in this Court*

On August 30, 2021—four days after filing its amended complaint in the USCFC—Crowley filed the instant two-count complaint in this Court seeking "declaratory and injunctive relief against GSA" only "to stop it from interfering with" the Contract between Crowley and USTRANSCOM.  Compl. ¶ 1.  In Count I, Crowley invokes the judicial review provisions of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, alleging that GSA exceeded, and continues to exceed, its statutory authority by conducting its improper audits and issuing erroneous NOCs.  Compl. ¶¶ 108–126. As a result, Crowley asserts that GSA's actions should be held unlawful and set aside under the APA.  *See id.* ¶ 109.  In Count II, Crowley alleges in the alternative that "GSA's actions are *ultra vires*" warranting judicial review and injunctive relief because "no other remedy is available."  *Id.* ¶¶ 128–29.  Crowley stresses that no contractual remedy or money damages are sought against GSA (or USTRANSCOM).  *Id.* ¶¶ 99–102. Instead, Crowley seeks only equitable relief prospectively precluding GSA from conducting audits and issuing NOCs contrary to the interpretations of the Contracting Officer.  *Id.* ¶ 107; *id.* at 18 (Prayer for Relief).

Two days later, Crowley moved for a preliminary injunction on September 1, 2021, seeking to enjoin GSA from auditing its invoices to USTRANSCOM or, if such audits are

authorized, issuing NOCs contrary to the findings of the Contracting Officer's interpretation of the contract.  Pl.'s Mot. Prelim. Inj. at 1–2, ECF No. 9.  Following a briefing schedule proposed by the parties, GSA responded on September 15, 2021, with a motion to dismiss combined with an opposition to Crowley's motion for preliminary injunction.  Defs.' Opp'n Pl.'s Mot. Prelim. Inj. & Mot. Dismiss, ECF No. 13.  With briefing completed on October 8, 2021, defendants' motion to dismiss was granted, on October 22, 2021, upon finding that "the fundamental grievance underlying plaintiff's cases before both the CFC and this Court is that it furnishes transportation-related services to the government pursuant to the Contract and does not get paid the full amount it believes it is due," such that the Tucker Act conferred exclusive jurisdiction upon the Court of Federal Claims because the claims were in essence contractual claims. *Crowley I*, 2021 WL 4940953 at *11; *see also id.* at *1 (summarizing dispute as follows: "GSA is not a party to the contract underlying this dispute, but in performing its auditing function has adopted and persists in applying a different interpretation of plaintiff's contract than that of the actual contracting party USTRANSCOM, leaving plaintiff in the difficult and expensive circumstance of performing under the contract but without getting paid the amounts that both contracting parties apparently believe to be owed" (internal citations omitted)).  Crowley's motion for preliminary injunction was then denied as moot.

The D.C. Circuit reversed this decision on July 1, 2022, holding that this Court erred in dismissing this case for lack of subject matter jurisdiction.  Crowley's action in the instant litigation is not "'at its essence' contractual because Crowley does not seek to enforce or recover on the contract with TRANSCOM," nor does it seek monetary relief.  *Crowley II*, 38 F. 4th at 1102.  The D.C. Circuit held that this Court has jurisdiction of the action under the APA and general federal question statute, and reversed and remanded the dismissal of the action.

Upon remand, defendants sought a stay on August 23, 2022, arguing that the USCFC should be permitted to resolve *Crowley Gov't Servs., Inc. v. United States*, No. 21-cv-1405, before the progression of this lawsuit. *See* Defs.' Mot. Stay, ECF No. 29. The irony of defendants' effort to stay the instant suit was obvious, given the United States' effort a year earlier to dismiss Crowley's action before the USCFC; in any event, the stay request was denied, on September 19, 2022, since the USCFC and instant lawsuit are separate cases, with diverging causes of action, relevant evidence, and sought-after relief. *Crowley Gov't Servs. v. GSA*, Case No. 21-cv-2298 (BAH), 2022 WL 4299825, at *1–2 (D.D.C. Sep. 19, 2022). The Court further noted that equitable considerations favored denying a stay, in light of the severe potential hardship faced by Crowley. At the time of the stay denial decision, the parties' tolling agreement suspending the issuance of NOCs and deductions for outstanding NOCs was scheduled to expire on November 19, 2022, and GSA's resumption of issuing NOCs and seizing payments from Crowley loomed near. *Id.* at *3.

While defendants' motion to stay was being briefed by the parties, Crowley sought a "Speedy Declaratory Judgment Hearing," requesting consolidation of "its preliminary injunction motion with a determination of the merits," a speedy hearing and judgment on the merits. Pl.'s Mot. Decl. J., ECF No. 31. In turn, defendants cross-moved for partial judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and opposed plaintiff's motion. Defs.' Mot. Partial J., ECF No. 42.[3] Defendants filed the administrative record on January 13, 2023, *see*

---

[3] Defendants filed this cross-motion only after some foot-dragging. Even after denial of defendants' motion to stay, defendants moved for an extension of time to respond to Crowley's motion for declaratory judgment. Ignoring the Court's admonition that the "equitable considerations [weigh] in favor of this Court exercising its jurisdiction without delay," *Crowley Gov't Servs.*, Case No. 21-cv-2298 (BAH), 2022 WL 4299825, at *3, defendants requested an extension of four months—until January 31, 2023—to respond to Crowley's motion, citing the ongoing discovery in the USCFC and the need to "closely review the briefs in the Federal Claims Court." *See* Defs.' Resp. Order to Show Cause &, in Alternative, Mot. for Extension of Time File Resp. Pl.'s Mot. Hr'g, ECF No. 39. This motion was denied in part, allowing defendants until October 11, 2022 to file any opposition to Crowley's motion. *See* Min. Order (Sept. 28, 2022).

Administrative Record, ECF No. 50, which was supplemented on February 9, 2023, after the Court directed defendants to explain a gap of approximately 800 pages in the record as submitted.  *See* Min. Order (Jan. 19, 2023); Defs.' Errata Regarding Submission of Administrative Record, ECF No. 54.[4]

    With the parties' cross-motions for judgment otherwise ripe, review of the briefing revealed gaps that would benefit from additional explication and thus the parties were directed to submit a joint status report advising the Court whether the parties sought referral to mediation, and if not, ordered the parties to file supplemental briefing regarding a host of issues raised without adequate address by the parties' submissions.  *See* Min. Order (Jan. 19, 2023).  Question 1 of the Order directed both parties to explain (a) whether any deference was owed to GSA under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), (b) whether DoD and GSA diverge in their interpretation of the Transportation Act, and whether DoD's views should be elicited, (c) how the Court should reconcile differing interpretations of the Transportation Act between the agencies, (d) why the *Chevron* doctrine was not addressed by the parties, and (e) whether the Court's ruling could impact other non-party agencies to warrant including any such agencies as intervenors in the instant litigation.  Min. Order (Jan. 19, 2023).  The Order, in Question 2, further directed the government to (a) explain DoD's position as to whether Crowley is a "carrier or freight forwarder," pursuant to subsections of 31 U.S.C. § 3726, and (b) whether that position should be elicited formally, (c) explain any national security concerns implicated by

---

[4]    On the very day that GSA was required to "file a certified list of the contents of the administrative record," pursuant to Local Rule of Civil Procedure 7(n)(1), GSA filed a motion to be relieved of the local rule.  *See* Defs.' Mot. Relief from L. Civ. R. 7(n)(1), ECF No. 47.  Defendants explained the motion was filed only "out of [an] abundance of caution," *id.* at 1, and apparently was based on defendants' prior statement (unsupported by any arguments) that an administrative record was unnecessary, *see* Defs.' Mem. Partial J. at 4, and defendants' belief that the filing of such a statement unilaterally exempted the government from the requirements of the local rules and Administrative Procedure Act.  This motion was denied and defendants ordered to file the administrative record by January 13, 2023.  *See* Min. Order (Dec. 27, 2022).

GSA's position in this litigation, and (d) confirm that the administrative record is complete as to DoD's position.  Thirdly, the government was directed to (a) confirm that the administrative record was complete in reflecting any negotiated solution between DoD and GSA, (b) identify where that solution may be found in the administrative record, and (c) barring any negotiated solution, identify any articulation by DoD as to its concerns on this matter.  Fourth, the government was directed to explain a more-than-800-page gap in the administrative record. Fifth, the government was directed to explain its "reasons for delaying the adjudication of this matter" by failing timely to file an administrative record, instead filing a motion to be relieved of such filing on the very day it was due.  *Id.* (quoting Defs.' Mot. Relief from L. Civ. R. 7(n)(1), ECF No. 47).  Finally, the government was directed to explain (a) GSA's "policy regarding the appropriate scope of its auditing authority under the Transportation Act and whether this scope includes overriding the contracting agency's interpretation of a contract's terms," (b) why the Contracting Officer's decision should not be final vis-à-vis further GSA action, and (c) whether operation of 31 U.S.C. § 3726(c)(1) distinguishes this case from the non-binding cases *Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357 (Fed. Cir. 2002) and *Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014 (Fed. Cir. 1995).  *Id.*  Responses to all questions were ordered to be filed by January 26, 2023.

The parties subsequently agreed to "mediate or engage in other informal dispute resolution" until March 13, 2023, *see* Stip. Regarding Jan. 19, 2023 Min. Order at 2, ECF No. 51, and the Court stayed the case with the exception of defendants' responses regarding the completeness of the administrative record until March 13, 2023.  *See* Min. Order (Jan. 26, 2023); Defs.' 1st Resp. Min. Order, ECF No. 52.  Upon the parties' failure to resolve this case out of court, on March 13, 2023, the parties filed a barrage of supplemental briefing in response to the

Court's multiple inquiries, *see* Pl.'s Suppl. Br. ("Pl.'s Resp. Min. Order"), ECF No. 59 & Defs.'

Resp. Questions 1, 2, 5, & 6 of Ct.'s Jan. 19, 2023 Min. Order ("Defs.' 2d Resp. Min. Order"),

ECF No. 60, as well as responses to those supplemental filings, *see* Defs.' Reply Pl.'s Resp. Jan.

19, 2023 Min. Order (Question 1) ("Defs.' Opp'n Pl.'s Resp. Min. Order"), ECF No. 62; Pl.'s

Resp. Defs.' Suppl. Brief ("Pl.'s Opp'n Defs.' 2d Resp. Min. Order"), ECF No. 63; Defs.' Reply

Pl.'s Resp. Ct.'s Jan. 19, 2023 Min. Order (Questions 2, 5, & 6) ("Defs.' Reply Supp. 2d Resp.

Min. Order"), ECF No. 64; Pl.'s Notice Regarding Defs.' March 30, 2023 Filing, ECF No. 65.[5]

The parties completed their supplemental briefing on March 31, 2023, but the docket did

not stay dormant long.  On April 17, 2023, defendants submitted a "Status Report" advising that,

on April 3, 2023, they had made a settlement offer and served Crowley an offer of judgment

pursuant to Fed. R. Civ. P. 68.  Defs.' Status Report, ECF No. 66.  Crowley responded that any

offer made by GSA did not satisfy Rule 68 and urged that "there remain[ed] no realistic prospect

of settlement at this time."  Pl.'s Resp. Defs.' Status Report, ECF No. 67.

This settlement offer was followed by defendants' filing of another "Status Report" on

April 24, 2023, advising that GSA sent a letter to Crowley that the agency believed rendered the

case moot.  Defs.' 2d Status Report, ECF No. 68.  This letter, attached to defendants' status

report, contained the following five enumerated promises to Crowley by an official from GSA.

*Id.,* Ex. 1., Letter from Assistant Comm'r Crystal Philcox, Off. of Travel, Transp. & Logistics,

---

[5]      The Court directed the parties to respond to its questions by March 13, 2023 and noted that "[a]ny
extension request, unless jointly made and consented to, must be supported by clearly compelling reasons," *see* Min.
Order (Jan. 26, 2023), but defendants moved unilaterally to extend the deadline to respond to the Order, seeking to
respond to one portion of the Court's questions by March 27, 2023, and another portion by April 13, 2023.  *See* Mot.
Extension of Time Resp. to Court's Jan. 19, 2023 Min. Order, ECF No. 56.  Although GSA based its motion on the
"significant time" devoted by defendants to settlement negotiations, *id.* at 2, Crowley clarified that "GSA counsel
never contacted Crowley to initiate discussions," and the parties only began settlement discussions on March 7,
2023, with less than a week remaining in the stay, Pl.'s Opp'n Defs.' Mot. Extension of Time Resp. to Court's Jan.
19, 2023 Min. Order at 2–3, ECF No. 57.  Defendants' motion was denied, noting that GSA's justification that
global settlement discussions were ongoing in the related USCFC case did not excuse defendants from their
obligations in this case.  *See* Min. Order (March 11, 2023).

GSA, to Patrick Wallace, Vice-President, Supply Chain Sols., Crowley Gov't Servs., Inc. (April 21, 2023) ("April 21, 2023 GSA Letter"), ECF No. 68-1.  First, "GSA will refund the roughly $29.6 million withheld as a result of outstanding Notices of Overpayment to Crowley," as a result of GSA's audits of the DFTS Contract—representing all NOCs collected upon except for $11.8 million "currently subject to litigation" in the USCFC.  *Id.*  Second, GSA "will not further audit any bills submitted by Crowley to USTRANSCOM under the DFTS Contract . . . pursuant to 31 U.S.C. § 3726(b), for the duration of that contract, including any options and extensions." *Id.*  Third, GSA promised to refund $35,840.43 withheld as a result of outstanding NOCs issued pursuant to a separate contract between Crowley and USTRANSCOM, called the "Ocean USC 9 contract."  *Id.*  Fourth, GSA promised to stop auditing any bills pursuant to 31 U.S.C. § 3726(b) submitted by Crowley to USTRANSCOM under the Ocean USC 9 contract.  *Id.*  Finally, "[i]f or when GSA conducts any audits under 31 U.S.C. § 3726, GSA will audit the contract in accordance" with the instructions of the contracting agency and Contracting Officer, adding that the "contracting officer is the final authority on the terms of the contract."  *Id.*  To that end, GSA and USTRANSCOM created a coordination board "to ensure there is no confusion on the terms of any contracting officer decisions."  *Id.*  Crowley disputed that this letter rendered the instant litigation moot, *see* Pl.'s Resp. Defs.' 2d Status Report, ECF No. 69, and defendants proceeded to file a motion to dismiss on the basis of the April 21, 2023 GSA Letter.  Defs.' Mot. Dismiss, ECF No. 70.

In sum, currently pending before this Court are two sets of briefings: first, Crowley's Motion for Speedy Declaratory Judgment Hearing, ECF No. 31, and defendants' Motion for

Partial Judgment, ECF No. 42, together with the numerous supplemental briefings as described, and second, defendants' Motion to Dismiss, ECF No. 70.  All three motions are ripe for review.[6]

## II.    LEGAL STANDARD

Under the Declaratory Judgment Act, invoked by Crowley in its pending motion, a court "may declare the rights and other legal relations of any interested party" in "a case of actual controversy within its jurisdiction."  28 U.S.C. § 2201(a).  "The term 'actual' is . . . one of emphasis, and not indicative of a different standard from Article III as to what qualifies as a controversy."  *Fed. Express Corp. v. Air Line Pilots Ass'n*, 67 F.3d 961, 963 n.2 (D.C.Cir.1995).  "[T]o satisfy the Constitution's case or controversy requirement, a party filing a declaratory judgment action must show that there is a controversy of 'sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'"  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1073 (D.C. Cir. 1998) (quoting *Fed. Express*, 67 F.3d at 964).  There must be "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Fed. Express*, 67 F.3d at 963–64 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)).  Even if a controversy exists, however, a district court has broad discretion to abstain from entertaining an action for declaratory judgment.  *Wilton v. Seven Falls Co*., 515 U.S. 277, 287 (1995) (noting "the unique breadth of [a district court's] discretion to decline to enter a declaratory judgment"); *Jackson v. Culinary Sch. of Wash., Ltd.*, 59 F.3d 254, 256 (D.C.

---

[6]    The parties quibble over whether Crowley's preliminary injunction motion, which was denied as moot in *Crowley I,* 2021 WL 4940953 at *1, "remains pending" in light of the D.C. Circuit's reversal of *Crowley I*'s dismissal for lack of subject matter jurisdiction.  Pl.'s Mem. Decl. J. at 4; Defs.' Mem. Partial J. at 8 & n.1.  As Crowley acknowledges, "the Court's final resolution would obviate the need for a separate ruling on the preliminary injunction," Pl.'s Opp'n Defs.' Mot. Partial J. & Reply Supp. Mot. Speedy Decl. J. ("Pl.'s Opp'n Defs.' Mot. Partial J.") at 6, ECF No. 44, and consequently, this nearly-two-year-old preliminary injunction motion is merged into the ultimate resolution of Crowley's claims.

Cir. 1995) (stating that the Supreme Court "took great pains to emphasize the singular breadth of the district court's discretion to withhold declaratory judgment").

As to defendants' motions, Fed. R. Civ. P. 12(c) authorizes a party to move for judgment "[a]fter the pleadings are closed—but early enough not to delay trial."  A motion for judgment on the pleadings is resolved essentially in the same manner as a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  *Rollins v. Wackenhut Servs. Inc.*, 703 F.3d 122, 130 (D.C. Cir. 2012).  In deciding a motion brought under either Rule 12(b)(6) or Rule 12(c), a court may not consider matters "outside the pleadings" without converting the motion to one for summary judgment.  Fed. R. Civ. P. 12(d).  Nevertheless, without triggering the conversion rule, a court may consider "only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *Hurd v. Dist. of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)).  "If the district court considers other facts, it must convert the motion to dismiss into a motion for summary judgment and 'provide the parties with notice and an opportunity to present evidence in support of their respective positions.'"  *Id.* (quoting *Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011)).

## III.   DISCUSSION

Crowley frames the key questions for resolution here to be: (1) whether GSA is statutorily authorized to audit Crowley's performance under the DFTS Contract, pursuant to 31 U.S.C. § 3726(b), and (2) whether GSA's continued audits and issuance of NOCs contrary to the Contracting Officer's Final Decisions violate the Contract Disputes Act's finality clause, 41 U.S.C. § 7103(g).  *See* Pl.'s Mem. Decl. J. at 1.  In light of GSA's motion to dismiss on the basis

of mootness, however, the first issue to address is whether a live case or controversy remains for decision, because a "case that becomes moot at any point during the proceedings . . . is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018). For the reasons that follow, this case is not moot. With that threshold determination made, the parties' motions for judgment are then addressed.

### A.   Mootness

Under Article III of the Constitution, federal court jurisdiction is limited to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. The Supreme Court has interpreted that limitation to require that "an actual controversy . . . be extant at all stages of review, not merely at the time the complaint is filed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160 (2016) (quoting *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 67 (1997)). "Two interrelated doctrines—standing and mootness—give life to this requirement. While standing probes 'the plaintiff's concrete stake at the outset of the litigation, mootness depends on whether the parties maintain a continuing interest in the litigation today.'" *Citizens for Resp. & Ethics in Wash. v. Wheeler ("CREW")*, 352 F. Supp. 3d 1, 8 (D.D.C. 2019) (quoting *Hardaway v. Dist. of Columbia Housing Auth.*, 843 F.3d 973, 979 (D.C. Cir. 2016)). For that reason, "[i]f an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990)). In the content of injunctive litigation, as here, "if there remains no conduct to be enjoined, then normally there is no relief that need be granted, the case or controversy has ceased, and the jurisdiction of the court has expired under Article III." *True the Vote, Inc. v. Internal Revenue Servs.*, 831 F.3d 551, 561 (D.C. Cir. 2016). If, for example, "the court can provide no effective remedy because a party has already obtained all the

relief that it has sought," a case has become moot and thus federal courts lack jurisdiction to decide the matter. *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (internal citations omitted); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause." (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

Defendants urge that, in the wake of the promises made in GSA's April 21, 2023 Letter to Crowley, this nearly two-year-old lawsuit has reached its end, because Crowley's "requested relief is now fully addressed." Defs.' Mot. Dismiss at 1. Indeed, the complaint sought a declaratory judgment that (1) "GSA is not authorized to audit the [DFTS] contract under 31 U.S.C. § 3726(b)," and (2) "GSA's NOCs violate the finality of the Contracting Officer's final decisions and that GSA is not authorized to ignore and subordinate the Contracting Officer's Final Decisions to GSA's independent determinations." Compl. at 18 (Prayer for Relief). Further, Crowley sought an "injunction prohibiting GSA from conducting any further such audits and issuing such NOCs," and any other relief deemed "just and proper" by the Court. *Id.* Crowley thus "did not request *retroactive* relief for the monetary value of the time and effort spent challenging the NOCs but did, . . . as made clear in its Prayer for Relief, seek *prospective* relief from GSA's audits and NOCs in the future." *Crowley II*, 38 F.4th at 1112. Defendants argue that GSA has now provided full prospective relief by pledging not to "audit any bills submitted by Crowley to USTRANSCOM under the DFTS contract . . . pursuant to 31 U.S.C. § 3726(b)" and to cease pursuing any uncollected but issued NOCs. *See* April 21, 2023 GSA Letter.

Defendants' mootness argument, however, arises entirely from their voluntary actions during the course of this litigation and, "[a]s a general rule, a defendant's voluntary cessation of

allegedly illegal conduct does not deprive [a court] of power to hear and determine the case."
*Am. Bar Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011) (quoting HARRY T. EDWARDS &
LINDA A. ELLIOTT, FEDERAL STANDARDS OF REVIEW—REVIEW OF DISTRICT COURT DECISIONS
AND AGENCY ACTIONS 114–15 (2007)).  Under what is called the voluntary cessation exception
to mootness, "a defendant cannot automatically moot a case simply by ending its unlawful
conduct once sued," because it may be "free to return to [its] old ways."  *Already, LLC v. Nike,
Inc.*, 568 U.S. 85, 91–92 (2013) (quoting *Deakins v. Monaghan*, 484 U.S. 193, 201 n.4 (1988)).
Instead, "a defendant's voluntary cessation of allegedly unlawful conduct can moot a case only if
(i) 'there is no reasonable expectation . . . that the alleged violation will recur,' and (ii) 'interim
relief or events have completely and irrevocably eradicated the effects of the alleged violation.'"
*Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016) (quoting *Am. Bar Ass'n,* 636 F.3d at 648).
Defendants bear the "formidable burden of showing that it is absolutely clear the allegedly
wrongful behavior could not reasonably be expected to recur."  *Already*, 568 U.S. at 91 (quoting
*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000))*.  See
also West Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2607 (2022) (describing the burden of
establishing mootness as "heavy" where "[t]he only conceivable basis for a finding of mootness
in th[e] case is [the respondent's] voluntary conduct" (quoting *Friends of the Earth,* 528 U.S. at
189)); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA II")*, 918 F.3d
151, 157 (D.C. Cir. 2019) (holding that only "[i]f a defendant can demonstrate that there is no
reasonable expectation that the allegedly unlawful conduct will recur" may a claim be moot).
The conjunctive prongs of the voluntary cessation exception are addressed *seriatim*.

1.      *Reasonable Expectation of Recurrence*

Defendants fail to shoulder their heavy burden to demonstrate that the challenged conduct will not recur. [7]  On this front, Crowley contends that defendants' audits of the DFTS Contract might resume because "nothing would prevent GSA from changing this policy later, which may occur, for example, with new leadership."  Pl.'s Opp'n Mot. Dismiss at 8, ECF No. 71.  Further, GSA's commitment to cease auditing Crowley's current contracts represents an inherently unstable, narrow carve-out—justified by no explicit reasoning—in what appears to be its otherwise ongoing and consistent policy, pursuant to the agency's interpretation of its statutory authority under 31 U.S.C. § 3726(b), of auditing other transportation services contracts that, like the DFTS Contract, were awarded under the FAR and, further, requiring contractors disputing NOCs issued by GSA to use GSA's administrative review process, even when the relevant Contracting Officer disagrees with the issuance of the NOCs.  *See id.* at 8–9, 21–25.  In response,

---

[7]      The parties disagree in "defining the wrong that the defendant is alleged to have inflicted," or, in other words, "the 'old ways' to which the voluntarily ceasing defendant might return."  *Clarke v. United States*, 915 F.2d 699, 703 (D.C. Cir. 1990).  Crowley urges this issue is correctly framed as whether GSA will resume conducting audits of both Crowley's currently existing contracts *and* any future FAR-based contracts.  Pl.'s Opp'n Mot. Dismiss at 3, 11–15, 20–21.  Defendants, by contrast, seek to limit this case to the DFTS Contract, arguing that only the DFTS Contract is "at issue in this litigation," and the proper analysis is whether GSA is likely to resume auditing *that* contract.  Defs.' Mot. Dismiss at 11.  Crowley has the better argument, because in the analogous context of the capable-of-repetition-yet-evading review exception to mootness, the D.C. Circuit has defined the alleged wrong in terms of "the legal wrong complained of by the plaintiff," rather than whether "the precise historical facts that spawned the plaintiff's claims are likely to recur."  *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009).  In *Del Monte,* where the complained-of delay by the Treasury Department in granting a sanctions license was potentially mooted by the license's approval, the D.C. Circuit emphasized that "what matters is whether it is reasonably likely that Del Monte will suffer the same type of legal wrong—unlawfully withheld approval or unlawful delay" in the future—a question the D.C. Circuit answered in the affirmative because the plaintiff's business relied upon applying for and receiving such licenses.  570 F.3d at 324–25.  Del Monte also provided evidence that the Treasury Department was not likely to approve future applications with any more alacrity.  *Id*.  So too here: the legal wrongs complained of by Crowley are GSA's auditing practices in excess of its statutory authority, particularly when in tension with a Contracting Officer's final decisions, and GSA's imposition of its own administrative review process, and Crowley is likely to encounter these "legal wrong[s]" again.  For the past 25 years, Crowley has continuously performed at least one FAR-based transportation-related contract and is currently competing for another.  *See* Pl.'s Opp'n Mot. Dismiss, Ex. B, Decl. of Patrick Wallace, Vice President of Supply Chain, Crowley Government Services, Inc. ¶ 5, ECF No. 71-2.  Regardless, having determined that defendants have not shouldered their burden to disprove the reasonable likelihood of recurrence *even* as to the DFTS Contract, this issue need not be further addressed.

GSA doubles down on the promises made in the April 21, 2023 GSA Letter by reiterating, in a

sworn affidavit, assurances about not auditing Crowley's current contracts and insisting that, as a

government agency, it "is entitled to the presumption of regularity."  Defs.' Reply Supp. Mot.

Dismiss at 2, 7–8; Philcox Decl., ECF No. 73-1.  Further, defendants note that the agency has

demonstrated its sincerity by proactively offering not to audit Crowley's Ocean USC 9 Contract,

as well as by refunding nearly $30 million withheld due to outstanding NOCs under the DFTS

Contract.  *See* Defs.' Reply Supp. Mot. Dismiss at 2.

GSA is correct that many courts of appeals have given declarations by government

officials "somewhat higher credence than statements made by private parties" in voluntary

cessation analyses.  *PETA II*, 918 F.3d 151, 157–59 (collecting cases); *Sossamon v. Lone Star

State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009); *Coral Springs St. Sys. Inc. v. City of Sunrise*,

371 F.3d 1320, 1328–29 (11th Cir. 2004) (granting government officials "considerably more

leeway than private parties in the presumption that they are unlikely to resume illegal

activities").[8]  At the same time, courts, including the Supreme Court, regularly find that

government actors' stated intentions failed to prove that their voluntary cessation of challenged

conduct mooted litigation.  *See, e.g., West Virginia,* 142 S. Ct. at 2607 (holding that the

government's representation that "EPA ha[d] no intention of enforcing the [challenged] Clean

Power Plan" failed to moot the case, because the government "vigorously defend[ed]" the

legality of its prior approach); *Trinity Lutheran Church v. Comer*, 582 U.S. 449, 454, 457 n.1

(2017) (holding case not moot because whether a Missouri state agency would revert to its prior,

---

[8]      Courts justify this presumption of good faith on the basis that government officials "are public servants, not
self-interested private parties."  *Sossamon*, 560 F.3d at 325; *accord U.S. Navy SEALS 1-26 v. Biden*, 72 F.4th 666,
673–74 (5th Cir. 2023).  Where a government agency earns a bounty for each adverse action it takes against a
private party, however—as in the case of GSA's post-payment audit program, pursuant to 31 U.S.C. § 3726(e)—this
incentive structure may not merit the presumption that the government agency's actions are unsullied by self-
interest.  The parties do not address this potential conflict-of-interest in undermining this presumption, however, and
the Court need not do so here.

challenged policy of denying grants to religiously affiliated applicants was not "absolutely clear," noting the parties' positions that "no clearly effective barrier [] would prevent the [agency] from reinstating [its] policy in the future," and, in any case, the "policy change [did] nothing to remedy" its source, which was the Missouri Supreme Court's interpretation of the state Constitution).

The D.C. Circuit's decision in *PETA II* provides some clarity as to the appropriate weight of an official's promise that the challenged conduct will not recur.  There, PETA sought declaratory and injunctive relief pursuant to the Freedom of Information Act against the U.S. Department of Agriculture's removal of certain documents from its website, which removal the agency announced was for the purposes of excising personal information contained within them.  918 F.3d at 153.  After the litigation began, USDA re-posted many of those documents, advising the district court in a letter that the agency was in the process of posting additional documents— conduct that the district court concluded rendered PETA's claims as to those documents moot. *People for Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA I")*, 285 F. Supp. 3d 307, 312–13 (D.D.C. 2018).

The D.C. Circuit remanded the case to the district court with the instruction that, if the agency supplemented its letter to the district court to "make[] clear that it commits to timely posting on an ongoing basis," rather than merely describing its current practice, that declaration would moot certain of PETA's claims.  *PETA II*, 918 F.3d at 159.  At first glance, this ruling might appear to indicate that the GSA official's commitment permanently to cease auditing the DFTS Contract suffices under D.C. Circuit precedent—but this outcome in *PETA II* hinged on the totality of the circumstances, rather than solely resting on the "presumption of regularity when government officials express a clear intention to do as the complaint requests."  *Id.*  The

panel emphasized "USDA's seemingly unproblematic rationale for removing the records; the one-time nature of the takedown; [and] the absence of any signs of bad faith in litigation." *Id.* Accordingly, *PETA II* did not turn on the mere say-so of the agency as to its future conduct, but rather the district and appeals courts' determinations that, based on the totality of the circumstances, USDA was unlikely to engage in the challenged conduct again. *Accord Djadju v. Vega*, 32 F.4th 1102, 1109 (11th Cir. 2022) ("[A] court should find a case moot when the totality of the circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged policy." (internal quotations omitted)).

The circumstances surrounding USDA's voluntary cessation in *PETA II* differs sharply from the present case.  In its initial opinion, the district court was persuaded that USDA had engaged in the challenged conduct of removing documents from its website as a temporary, one-time measure to review them for redactable FOIA-exempt personal information; consequently, it was "reasonably certain that the Department [would] not remove the records again." *PETA I*, 285 F. Supp. 3d at 313.  Here, by contrast, GSA has engaged in the challenged conduct of auditing the DFTS Contract as a matter of course, as memorialized in the 2016 MOA between USTRANSCOM and GSA, *see* AR Part II at GSA_000417–26 (articulating GSA's authority to audit transportation bills pursuant to 31 U.S.C. § 3726), and clearly intends to continue to do so with regard to all other contracts, including contracts Crowley may enter with USTRANSCOM in the future.  Although promising to cease audits of Crowley's current contracts, GSA's letter also states that, "[i]f or when GSA conducts any audits under 31 U.S.C. 3726, GSA will audit the contract in accordance with the . . . responsible contracting officer,"  April 21, 2023 GSA Letter at 2—indicating that GSA has merely carved out a specific exception for Crowley's current contracts, at odds with its ongoing policy and broad interpretation of the scope of its own

auditing authority.  *Accord Davis v. U.S. Parole Comm'n*, Case No. 20-cv-2897 (APM), 2021 WL 5758820, *4 (D.D.C. Dec. 3, 2021) (noting that, when an agency "maintained the legality of the challenged conduct," this "might help overcome the presumption of regularity" (citing *Trinity Lutheran Church*, 137 S. Ct. at 2019 n.1 & *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 702 (2007))).

In determining whether a governmental entity has met its burden to demonstrate that the challenged conduct will not occur, courts also emphasize the "structural obstacles to reimposing a challenged law" or policy.  *Alaska v. U.S. Dep't of Agric.*, 17 F.4th 1224, 1229 n.5 (D.C. Cir. 2021).  "[A]ctions that can be reversed at the stroke of a pen or otherwise face minimal hurdles to re-enforcement can thwart mootness."  *Id.*  In contrast, mootness follows where a challenged law has expired or been repealed, *see Burke v. Barnes*, 479 U.S. 361, 363–64 (1987); an agency's policy is nullified by intervening legislation, *see American Bar Ass'n,* 636 F.3d at 648; or a challenged regulation is rescinded or amended, *see New York State Rifle & Pistol Ass'n v. City of New York*, 140 S. Ct. 1525, 1526 (2020); *Akiachak Native Cmty. v. U.S. Dep't of Interior*, 827 F.3d 100, 113 (D.C. Cir. 2016).  The Sixth Circuit has articulated this consideration in terms of the degree of solicitude afforded government officials' future promises: on one hand, "[w]here regulatory changes are effected through formal, legislative-like procedures . . . the government need not do much more than simply represent that it would not return to the challenged policies," while on the other hand, when "the discretion to effect the change lies with one agency or individual, or there are no formal processes required to effect the change, significantly more than the bare solicitude itself is necessary to show that the voluntary cessation moots the claim." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th Cir. 2019).

GSA's commitment to Crowley appears to be "ad hoc, discretionary, and easily reversible," which weighs in favor of a determination that the agency has not met its burden. *Id.* at 768; *accord Alaska*, 17 F.4th at 1229 n.5.  Defendants' promises to Crowley are not attributable to the promulgation or rescission of a law or regulation, or memorialized in a public announcement by GSA or formal policy document.  Nor are these promises memorialized in an amendment to the DFTS Contract between USTRANSCOM and Crowley, or in the 2016 MOA between USTRANSCOM and GSA, both of which provide for GSA to conduct post-payment audits. *Cf. Already*, 568 U.S. at 93 (finding case moot based on "unconditional and irrevocable" covenant).  Whatever, if any, internal process was undertaken to yield GSA's commitment to Crowley, and how dependent such a promise may be on the continuing exercise of discretion of certain GSA personnel through March 1, 2025, the latest date when Crowley's Ocean USC-9 contract could expire, is just unclear. *See* Philcox Decl. ¶ 3.  GSA has thus provided no basis for the Court to conclude that a reversal of the policy would take anything more than "the stroke of a pen." *Alaska*, 17 F.4th at 1229 n.5.[9]

---

[9]    Defendants cite a handful of cases in which courts relied on government officials' declarations promising a policy change to find no reasonable expectation of recurrence, but all are distinguishable.  For example, in *Worth v. Jackson*, 451 F.3d 854 (D.C. Cir. 2006), mootness was found after the agency submitted an affidavit promising not to renew a challenged policy, which had expired during the course of the litigation, and crucially, plaintiff did not dispute that representation, instead arguing that any new policy might copy the same elements of the expired, challenged policy. *See* Defs.' Mot. Dismiss at 7.  In contrast, Crowley *does* dispute GSA's representation that the auditing cessation is permanent. *See* Pl.'s Opp'n Mot. Dismiss at 7–9.  Next, in *CREW*, 352 F. Supp. 3d at 1, EPA was found to demonstrate mootness in plaintiffs' challenge to an informal policy reportedly adopted by then-Administrator Scott Pruitt to avoid creating a paper trail of his official actions, allegedly in violation of the Federal Records Act, because Pruitt had resigned and EPA had adopted a new records management policy disseminated agency-wide, and thus to resume the challenged conduct, EPA would have to "decide to promulgate a new policy inconsistent with the FRA." *Id.* at 14.  Here, by contrast, GSA asks the Court to rely on nothing more than its letter and affidavit (which merely repeats the letter's contents), with no evidence that the underlying forces, including GSA's interpretation of its own authorities and concomitant resistance to engaging in negotiations with DoD to update or clarify the 2016 MOA, causing Crowley to be audited and subject to GSA's administrative appeals process, have dissipated.  Further, unlike in *CREW*, renewing the agency's challenged conduct would not involve clearly flouting the law, as the legality of GSA's auditing practices remains, in the absence of judicial decision-making on the scope and limits of GSA statutory authority, unresolved.

Defendants seek to moot this case based on little more than a paper promise. At the same time, GSA continues to assert its authority to audit the DFTS Contract, and apparently intends to continue executing that authority as to all other similar contracts. *See, e.g.,* Defs.' Resp. Pl.'s Surreply Defs.' Mot. Dismiss at 3, n.2, ECF No. 76-1 ("GSA does not require additional authority to audit FAR-based contracts; that authority already exists."). The April 21, 2023 GSA Letter provides a carve-out for Crowley's current contracts that can only be reasonably chalked up to an effort to moot the present litigation. This seemingly ad hoc promise, bereft of any indications of formal agency decision-making, does not carry defendants' "heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again." *Friends of the Earth,* 528 U.S. at 189 (internal quotations and alterations omitted).

### 2.   *Complete and Irrevocable Eradication of Alleged Violation's Effects*

Defendants' inability to demonstrate there is no reasonable expectation that the allegedly unlawful conduct will recur is enough to deny defendants' motion to dismiss, but the second criterion of the voluntary cessation exception—namely, that defendants have, through interim relief, "completely and irrevocably eradicated the effects of the alleged violation," *True the Vote*, 831 F.3d at 561—is also unmet. "The determination whether sufficient effects [of the alleged violation] remain to justify decision often will turn on the availability of meaningful relief." *Cierco v. Lew*, 190 F. Supp. 3d 16, 24 (D.D.C. 2016) (quoting 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Fed. Prac. & Proc.* § 3533.3.1 (3d ed. 2008)). Here, meaningful relief in the form of a declaratory judgment may still be provided.

Crowley points out that the April 21, 2023 GSA Letter stopped short of providing complete relief, in part, by omitting $11.8 million in payments withheld from Crowley based on outstanding NOCs. Pl.'s Opp'n Mot. Dismiss at 15; Pl.'s Surreply Defs.' Reply Supp. Mot.

Dismiss ("Pl.'s Surreply Mot. Dismiss") 1–3, ECF No. 74-1.[10]  Thus, Crowley reasons that "if this Court enters declaratory judgment finding that GSA does not have authority to audit Federal Acquisition Regulation ('FAR')-based contracts, as Crowley has requested from the outset, such judgment will have a direct impact on the legality of these monetary offsets pending in the Court of Federal Claims."  Pl.'s Surreply Mot. Dismiss at 2.  In other words, Crowley argues that since "*some* form of effective relief . . . however partial the remedy, however uncertain its potential to truly address Plaintiffs' concerns," may be granted, in the form of a declaratory judgment that can then serve as a predicate for monetary damages in the USCFC, the case is not moot.  Pl.'s Opp'n Mot. Dismiss at 17 (quoting *Ctr. for Food Safety v. Salazar*, 900 F. Supp. 2d 1, 7 (D.D.C. 2012)).  Defendants encourage the Court to ignore this multi-million-dollar figure, arguing that "Crowley has adamantly maintained that it seeks no money or retroactive relief . . . and the issues pending in the Claims Court matter . . . are separate and distinct from this instant case."  Defs.' Reply Supp. Mot. Dismiss at 4–5.

Defendants' argument is unconvincing, because "[a] case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever to the prevailing party.'" *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012) (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).  "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Id.* at 307–08 (quoting *Ellis v. Bhd. Ry., Airline & Steamship Clerks*, 466 U.S. 435, 442 (1984)).  Here, a declaratory judgment holding that GSA was not authorized to audit the DFTS Contract would clearly implicate Crowley's interest in

---

[10]    Crowley identifies a number of deficiencies in GSA's promised relief rendering such relief incomplete, including the absence of any promise to alter GSA's auditing practices as to future contracts, and the continued reputational harm the company suffers from GSA's blizzard of NOCs, which harm is not ameliorated by the April 21, 2023 GSA Letter.  Pl.'s Opp'n Mot. Dismiss at 7–17.  These deficiencies need not be further addressed as grounds to deny defendants' motion to dismiss, having found that the voluntary cessation exception applies regardless.

prevailing in the ongoing USCFC litigation. *See Reeve Aleutian Airways, Inc. v. United States*, 889 F.2d 1139, 1143 (D.C. Cir. 1989) (noting plaintiff's argument that a decision invalidating the challenged procedures of the Commercial Airlift Review Board "may provide the basis for a subsequent action for money damages in the United States Court of Claims" was "not insignificant" for mootness); *British Caledonian Airways, Ltd. v. Bond*, 665 F.2d 1153, 1158 n.2 (D.C. Cir. 1981) ("[A]lthough it is now impossible for us to reverse the actions of the Administrator through injunctive relief, the remaining consequences of the litigation (i.e., the possibility of obtaining money damages [in the Court of Claims] concerning which we express no opinion) also prevent us from holding that this case is moot."); *see also Christopher Village, Ltd. v. Retsinas*, 190 F.3d 310, 315 (5th Cir. 1999) (holding that, "[a]lthough the injunction and mandamus requests are moot, Village's request for a declaratory judgment continues to present a live dispute," because it could "use [a] declaration as a predicate for a damages action against HUD in the Court of Federal Claims"); *Maine Cent. Ry. Co. v. Bhd. of Maint. of Way Emps.*, 813 F.2d 484, 487 (1st Cir. 1987) (declining to hold claims for injunctive and declaratory relief moot where decision could resolve a damages claim in a parallel action).[11]

---

[11]    Although cited by neither party, *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004), appears, at first blush, to preclude consideration of the potential relief flowing from a declaratory judgment's effect in the USCFC—which, if applicable, would mitigate the effect of any judgment here on Crowley's pending claims before the USCFC.  There, the Federal Circuit held that the Fifth Circuit lacked subject matter jurisdiction to issue such a "predicate" judgment in *Christopher Village v. Retsinas*, and declined to preclude the government from challenging its liability for breach pursuant to *res judicata*. *Id.* at 1326–29.  In *Christopher Village v. Retsinas*, plaintiffs, managers of a subsidized low-income housing complex, sued Department of Housing and Urban Development (HUD) officers, claiming that HUD unlawfully refused to entertain plaintiffs' request to raise the rent on residents in order to cover necessary repairs.  HUD had already accelerated plaintiffs' mortgage and assumed control of the property after plaintiffs failed to pay HUD's demand for the $2 million in needed repairs.  After the lawsuit was filed, however, the property was sold in a foreclosure sale and transferred to the ownership of the city, mooting plaintiffs' request for injunctive and mandamus relief.  All that remained was for the court to provide a "declaration that HUD violated its regulations and contracts," which declaration would serve as a "predicate for a damages action against HUD in the Court of Federal Claims." 190 F.3d at 315.  The Federal Circuit held that the Fifth Circuit lacked subject matter jurisdiction to grant such relief, because when plaintiffs' sought-after equitable forms of relief were mooted, an "adequate remedy" for its remaining monetary interest could be found in the Court of Federal Claims. 360 F.3d at 1327 (quoting 5 U.S.C. § 704).  In the Federal Circuit's view, the presence of an alternative "adequate remedy" barred the APA's waiver of sovereign immunity, and thus stripped the Fifth Circuit of subject matter jurisdiction over the remnants of the case. 360 F.3d at 1328.  That conclusion is not applicable

Accordingly, defendants' motion to dismiss is denied; the voluntary cessation exception to mootness applies to maintain this Court's jurisdiction.

### B.      Crowley's Declaratory Judgment Motion

The parties' remaining motions assume an unusual posture.  First, Crowley's so-named "Motion for Speedy Declaratory Judgment Hearing" is not, as the title suggests, merely a motion for a hearing, but rather a motion for "determination of the merits" and entry of judgment.  Pl.'s Mot. Decl. J. at 2.  "'[T]he requirements of pleading and practice in actions for declaratory relief are exactly the same as in other civil actions,'" and consequently, a party "may not make a *motion* for declaratory relief, but rather, the party must bring an *action* for a declaratory judgment," as Crowley did by requesting declaratory judgment in its Complaint.  *Kam-Ko Bio-Pharm Trading Co. Ltd. v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009) (first quoting 10B Wright, Miller, & Kane, *Fed. Prac. & Proc.* § 2768 (3d ed. 1998), then quoting *Int'l Bhd. of Teamsters v. E. Conf. of Teamsters*, 160 F.R.D. 452, 456 (S.D.N.Y. 1995)).  Accordingly, to be consistent with the Federal Rules, Crowley's motion must be construed as a motion for summary judgment under Rule 56, or dismissal under Rule 12, of the Federal Rules of Civil Procedure, in its *action* for declaratory judgment.  The D.C. Circuit has held that, where claims under the APA present only questions of law, "the sufficiency of the complaint is the question on the merits, and there is no real distinction in this context between the question presented on a 12(b)(6) motion and a motion for summary judgment."  *Marshall Cnty. Health*

---

here, because the D.C. Circuit has "made clear that the 'adequate remedy bar of § 704' does not address 'whether there is federal subject matter jurisdiction.'"  *Crowley II*, 38 F.4th at 1113 n. 11 (quoting *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 621 (D.C. Cir. 2017)).  Accordingly, the existence of an adequate remedy in the USCFC is irrelevant to this mootness analysis, and the Federal Circuit's opinion does not control.  *Accord Genesis Healthcare, Inc. v. Becerra*, 39 F.4th 253, 262–63 (4th Cir. 2022) (disentangling the requirements for a cause of action under the APA from the continuing requirements to defeat mootness, holding that the lack of a final agency action under 5 U.S.C. § 704 "does not lead to a finding of mootness; rather, it goes to the statutory requirements for suing an agency in court pursuant to the APA," which are examined at the outset of the suit).

*Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).  Still, because "it is probably the better practice for a district court always to convert to summary judgment," particularly here, where defendants have filed an administrative record that is relied upon—alongside reams of other exhibits attached to filings by the parties—Crowley's motion is construed as a motion for summary judgment.  *Id.* at 1226 n.5.  *See also Martin v. Donley,* 886 F. Supp. 2d 1, 6–7 (D.D.C. 2012) (converting motion for dismissal to motion for summary judgment where "both parties have presented material outside the pleadings (namely, the administrative record) for the Court to consider in adjudicating the motions"); *Deppner v. Spectrum Health Care Res., Inc.,* 325 F. Supp. 3d 176, 184 n.5 (D.D.C. 2018) ("[A] motion may be treated as one for summary judgment even if the parties have not been provided with notice or an opportunity for discovery if they have had a reasonable opportunity to contest the matters outside of the pleadings such that they are not taken by surprise." (quoting *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 86 (D.D.C. 2012))).

Defendants opposed Crowley's motion in a combined filing that also sought partial motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), moving for the dismissal of Crowley's alternative *ultra vires* claim (Count Two).  *See* Defs.' Mem. Partial J. at 4, 19–20.  Defendants, however, did not cross-move for summary judgment or any entry of judgment as to Count One.  Defendants' motion for judgment on Count Two, stating Crowley's alternative claim that GSA acted *ultra vires*, may be easily dispatched because Crowley's claim is properly considered under the APA, which is alleged as Count One in Crowley's complaint.[12] Consequently, defendants' motion to dismiss this alternative Count Two is granted.

---

[12]     Crowley acknowledges that, upon resolution of its claims under the APA—and is accomplished, *infra* Part III.B.2–3—"Crowley's alternative Count II would be moot."  Pl.'s Opp'n Defs.' Mot. Partial J. at 23.  The APA is the appropriate vehicle to review GSA's audits and issuance of NOCs related to the DFTS Contract.  GSA's seizure of funds from Crowley's payments due under the DFTS Contract, in execution upon its NOCs, constitutes "final

This case's cluttered docket boils down to a single operative motion—Crowley's as-construed summary judgment motion, ECF No. 31.  As noted, Crowley frames its dispute with GSA in terms of two questions.  First, is Crowley authorized under U.S.C. § 3726(b) to audit the DFTS Contract?  Pl.'s Mot. Decl. J. at 2.  Second, were "GSA's actions, including its audits and resulting NOCs . . . contrary to the Contracting Officer's final decisions and therefore [in violation of] 41 U.S.C. § 7103(g)"?  *Id.*  Crowley's second question is better understood as querying which of two potential statutory schemes—the dispute resolution scheme under the CDA, or the administrative review process set out in regulations promulgated pursuant to 31 U.S.C. § 3726—apply to Crowley's challenges to GSA's issued NOCs; if the CDA applies, then the statute's finality clause, 41 U.S.C. § 7103(g), controls.  Each question is addressed in turn, following an overview of the relevant statutes at issue.

### 1.    *Statutory Background*

At the heart of this case is the relationship between Section 322 of the Transportation Act's broad grant of authority to GSA to audit bills received by the government for transportation services, codified at 31 U.S.C. § 3726(b), and the dispute procedures for conflicts arising out of government contracts outlined in the CDA, 41 U.S.C. §§ 7101–7109.[13]  The parties

---

agency action" under 5 U.S.C. § 704, because GSA "ha[s] made up its mind, and its decision[s] . . . have inflict[ed] an actual, concrete injury upon the party seeking judicial review."  *AT&T v. EEOC*, 270 F.3d 973, 975 (D.C. Cir. 2001) (internal quotations omitted).  Nor is there an "other adequate remedy in a court," 5 U.S.C. § 704, because Crowley seeks different relief in this Court and in the USCFC.  *See Crowley II*, 38 F.4th at 1113 n.11.

[13]    The parties interchangeably refer to the Transportation Act of 1940 and Interstate Commerce Act (ICA), but for the sake of ease and clarity, the statutory scheme will be referred to as the Transportation Act.  True, the Transportation Act amended the ICA, which was originally enacted in 1887 to regulate the railroad industry, *see* Interstate Commerce Act, ch. 104, 24 Stat. 379 (1887), and has been repeatedly enlarged and amended to cover other modes of transportation and the ebbs and flows of industry regulation.  The Transportation Act of 1940, however, included the amendment that established the scheme of post-payment auditing and notices of overcharge for transportation-related services provided to the U.S. government and that is chiefly at issue in this litigation, *see* Transportation Act,  ch. 722, 54 Stat. 954 (1940), *as amended* 31 U.S.C. § 3726.  *See Tri-State Motor Transit Co. v. United States*, 39 Fed. Cl. 485, 488–95 (1997) (exhaustively describing the evolution of the Interstate Commerce Act).  A provision in the Transportation Act that is critical in this case is 31 U.S.C. § 3726(b), which was not added to that statute until almost sixty years later, in 1998.

agree that USTRANSCOM awarded the DFTS Contract to Crowley under the Federal

Acquisition Regulation (FAR), which sets forth the regulatory mechanisms associated with most

government procurement contracts—as opposed to under the Transportation Act, which provides

an alternative means for the federal government to contract for transportation services with

carriers, primarily through bills of lading and tender agreements, pursuant to 49 U.S.C. §§

10721, 13712.  Compl. ¶¶ 22, 28; Defs.' Answer ¶¶ 22, 28.  The DFTS Contract "incorporated

by reference" FAR 52.212-4 (2014), which regulation states that the contract is subject to the

CDA.  *See* AR Part I at GSA_000024.  Crowley urges that, as a result of this express provision,

the DFTS Contract is subject to the CDA and exempt from GSA's post-payment auditing

purview as set out in Section 322 of the Transportation Act.  Pl.'s Mem. Decl. J. at 14–18.

Defendants counter that the Transportation Act's broad grant of authority—permitting GSA to

"conduct pre- or post-payment audits of transportation bills of any Federal agency," 31 U.S.C. §

3726(b)—extends to FAR-based contracts, even if those contracts are also governed by the

CDA.  Defs.' Mem. Partial J. at 11–18.

  The relevant section of the Transportation Act, codified at 31 U.S.C. § 3726, provides

GSA's authority as to federal government transportation contracts under the umbrella title of

"Payment for Transportation."  Generally, Section 3726 provides authority for GSA audits, both

pre-payment and post-payment, of bills from a "carrier or freight forwarder," *see id*. §§

3726(a)(1), (d), (h), & (i)(1), and, in some subsections, refers more broadly separately or

disjunctively to "transportation bills" or "transportation services," *see id*. §§ 3726(b), (c)(1), and

also sets out related provisions for when GSA may exercise adjudicatory authority over disputes,

*see id*. §§ 3726(c)(1)–(2), (i)(1), and funding of such audits.[14]  As pertinent here, Section 3726

---

[14] Pursuant to Section 3726(e), GSA finances its expenses associated with transportation audits "from overpayments collected from carriers on transportation bills paid by the Government and other similar type

first requires "each agency that receives a bill from a carrier or freight forwarder for transporting an individual or property for the United States Government" to verify the accuracy of such bills prior to their payment, unless GSA has permitted an exemption of pre-payment auditing in favor of post-payment auditing.  31 U.S.C. § 3726(a).[15]  Second, Section 3726 grants the Administrator of General Services broad auditing authority by stating that the "Administrator may conduct pre- or post-payment audits of transportation bills of any Federal agency," and the "number and types of bills audited shall be based on the Administrator's judgment."  31 U.S.C. § 3726(b).  GSA points to this provision as authorizing its contested audits of Crowley's performance of the DFTS Contract.  *See* Defs.' Mem. Partial J. at 12.  Thirdly, the section gives GSA a referee role, directing the Administrator to "adjudicate transportation claims" when the "agency procuring the transportation services, or the carrier or freight-forwarder presenting the bill" cannot resolve them on their own, so long as the claim is received by the Administrator within three years of the dispute.  31 U.S.C. § 3726(c).  Fourth, the government may "deduct from an amount subsequently due a carrier or freight forwarder an amount paid on the bill that was greater than" the allowable rate, 31 U.S.C. § 3726(d), which is the provision by which GSA has withheld payments from Crowley to recover unpaid NOCs.  *See* Defs.' Mem. Partial J. at 12.

GSA's auditing and adjudicative authorities were expanded to the current version of Section 3726 in the Travel and Transportation Reform Act of 1998, Pub. L. No. 105-264, 112

---

refunds."  The third-party auditing companies' share of the overpayments identified by their audits is capped at 50 percent of the overpayments.  31 U.S.C. § 3726(e).  At least annually, the remaining amount of collected overpayments—"after making adequate provision for expense of refunds to carriers, transportation audit postpayment contracts, contract administration, and other expenses"—is transferred to the Treasury.  31 U.S.C. § 3726(f).

[15]     Although Section 3726 repeatedly refers to "carrier[s] or freight forwarder[s]," a "carrier" is defined as "a motor carrier, a water carrier, and a freight forwarder," so the term "freight forwarder" is subsumed within "carrier." 49 U.S.C. § 13102(3).

Stat. 2350, which overhauled Section 3726.[16]  Crucially, Section 3726(b), which broadly grants

GSA's pre- and post-payment auditing authority for "transportation bills" and serves as the focal

point of this case, was newly added by the 1998 Act.  As to GSA's adjudicative authority, before

the 1998 overhaul, Section 3726's subsection (a) stated, in two sentences addressing, first, that

payment may be paid on a bill before GSA conducts an audit and, in the second sentence,

limitation periods on claims over which GSA may exercise adjudicative authority:

> A carrier or freight forwarder presenting a bill for transporting an individual or property
> for the United States Government may be paid before the Administrator of General
> Services conducts an audit, in accordance with regulations that the Administrator shall
> prescribe.  A claim under this section shall be allowed only if it is received by the
> Administrator not later than 3 years (excluding time of war) after the later of the
> following dates: (1) accrual of the claim; (2) payment for the transportation is made; (3)
> refund for an overpayment for the transportation is made; or (4) a deduction under
> subsection (b) of this section is made.

31 U.S.C. § 3726(a) (1994); *see also* 41 C.F.R. § 101-41.601 (1998) (defining "claim[]"

expansively, including requests by claimants for amounts not included in the original billing and

amounts deducted or set off by the government, as well as unpaid bills "requiring direct

settlement by GSA").  The 1998 Act moved the provision's second sentence to subsection (c)(2),

with a new prefatory subsection (c)(1), which added that "[t]he Administrator shall adjudicate

transportation claims which cannot be resolved by the agency procuring the transportation

services, or the carrier or freight-forwarder presenting the bill."  31 U.S.C. § 3726(c)(1).  This

alteration made clear that GSA's adjudicative authority covers both claims arising from bills

presented by carriers or freight-forwarders and, more broadly, claims by an "agency procuring

the transportation services," *id.*, but only when the procuring agency "cannot [] resolve[]" the

---

[16]     The Travel and Transportation Reform Act of 1998 primarily sought to cut government transportation costs
by requiring federal employees to use government credit cards while traveling, and making pre-payment audits by
federal agencies of transportation expenses mandatory.  Previously, GSA's efforts to encourage agencies to audit
their transportation charges before payment were "generally unsuccessful even though prepayment audits have been
shown to generally save agency resources."  S. REP. NO. 105-295 (1998).

claim.  Transportation services encompass far more than the services of a carrier or freight

forwarder, as "transportation" is defined by the ICA as including, (a) "a motor vehicle, vessel,

warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind

related to the movement of passengers or property, or both . . ." and (b) "services related to that

movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration,

icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and

property."  49 U.S.C. § 13102(23) (2021).

Upon the foundation of Section 3726, GSA has constructed a massive regulatory

scaffolding, published at 41 C.F.R. § 102-118 *et seq.* (2022), which includes regulations, in

Subparts E and F, governing post-payment transportation audits and administrative review

procedures for post-payment audits.  *See* 41 C.F.R. §§ 102-118.400–445; 102-118.600–665.

When GSA's Transportation Audits Division conducts post-payment audits, the agency

"examine[s] and analyze[s] transportation documents and payments to discover their validity,

relevance and conformity with . . . contracts, agreements, or tenders and make[s] adjustments to

protect the interest of an agency."  *Id.* § 102-118.435.  Accordingly, when GSA identifies that a

transportation service provider owes an agency a debt, it issues a NOC, explaining the basis for

GSA's conclusion that the agency was overcharged.  *Id.* § 102-118.430.

Transportation service providers disagreeing with an issued NOC must navigate a

complex administrative process to contest GSA's decision.  First, the provider must submit a

written request for reconsideration to the Transportation Audits Division of GSA.  *Id.* § 102-

118.600.  Second, if GSA denies the request and proceeds to offset payments to the provider on

the basis of the NOC, the provider may then submit a claim to GSA for the amount taken.  *Id.* §§

102-118.450, 102-118.645.  Third, if GSA disallows that claim, a Settlement Certificate is

issued, and the provider may seek reconsideration by submitting a Request for Review by the Administrator of General Services. *Id.* §§ 102-118.610, 625. Alternatively, the provider may seek review of the settlement action in the Court of Federal Claims or Civilian Board of Contract Appeals, an executive tribunal within GSA. *Accord* Defs.' Mem. Partial J. at 10.

The Contract Disputes Act of 1978 seems more straightforward. The CDA was designed to provide a "fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving government contract claims"—a remedy to what was then a scattershot approach of resolving government contract disputes via contract provisions, disparate agency regulations, and varied statutes. S. REP. NO. 95-1118 (1978). The statute applies to "any express or implied contract . . . made by an executive agency for . . . [*inter alia*,] the procurement of services." 41 U.S.C. § 7102(a) (2021). The CDA requires that "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision" within six years of the claim's accrual. *Id.* § 7103(a). Contracting officers are appointed by the procuring agency to make and administer contracts and to make determinations and findings with respect to those contracts. *Id.* § 7101(6). The contracting officer's decision on the claim "is final and conclusive and is not subject to review by any forum, tribunal, or Federal Government agency, unless an appeal or action is timely commenced." *Id.* § 7103(g). To contest a contracting officer's final decision, the contractor may either appeal the decision to the relevant agency board—here, the Armed Services Board of Contract Appeals (ASBCA)—or bring an action directly in the Court of Federal Claims. *Id.* § 7104.

### 2. *GSA's Statutory Authority to Audit Pursuant to 31 U.S.C. § 3726*

The text of 31 U.S.C. § 3726(b) unambiguously authorizes GSA to audit the DFTS Contract, and principles of agency deference are therefore irrelevant to the provision's

interpretation.  *See Murray Energy Corp. v. Env't Prot. Agency*, 936 F.3d 597, 608 (D.C. Cir. 2019) (noting that "if a statute is clear, the court must give effect to Congress's unambiguous language and intent).[17]  The provision grants GSA the authority to "conduct . . . post-payment audits of transportation bills of any Federal agency."  31 U.S.C. § 3726(b).  Although "transportation bills" is not defined by statute nor by Section 3726's implementing regulations, "transportation" is defined by another provision of the ICA to include "services related to" the movement of people or property, including "arranging for" that movement.  49 U.S.C. § 13102(23).  The word "bill" takes its ordinary meaning: "an itemized account of the separate cost of goods sold, services performed, or work done."  *See Bill*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/bill.  Taken together, the meaning of "transportation bill" is simple and far-reaching, covering all itemized accounts of the costs of services rendered to the United States government related to the movement of people or property.  The expansive reach of Section 3726(b) acknowledges the GSA Transportation Audits Division's cross-cutting expertise in transportation-related accounting, which Congress intended to benefit all federal agencies that engage transportation-related services.  Charges arising from Crowley's performance of the DFTS Contract easily fit into the subsection's scope.  *See, e.g.,* AR Part I at GSA_000058 (DFTS Contract describing contractor as providing "[t]ransportation

---

[17]     Even if Section 3726(b) were ambiguous as to the authority of GSA to audit the DFTS Contract, defendants have not indicated exactly what administrative interpretation of the statute resolving this question should be granted deference.  Instead, in urging deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837 (1984), defendants' arguments collapse into incoherence.  Defendants argue both that the "unambiguous terms of the Transportation Act expressly authorize GSA to audit Crowley's contract," and that "the gap that Congress left for GSA to fill in section 3726 is broad."  Defs.' 2d Resp. Min. Order at 5–6.  Defendants go on to argue that GSA filled the statute's gap regarding "the entire procedure that GSA should follow when exercising its audit authority" via 41 C.F.R. § 102-118.435 and should receive deference as to this interpretation of the statute.  The problem is that the instant question is not *how*, but *whether*, GSA can audit certain contracts.  On this question, the entire regulatory scheme of 41 C.F.R. § 102-118 is surprisingly silent.  GSA separately points to the 2016 MOA that sets out the respective authorities of GSA and USTRANSCOM as to post-payment audits and dispute resolution—but this MOA also shirks any explicit resolution of whether Section 3726(b) authorizes GSA to audit FAR-based contracts like the DFTS Contract.  *See* Defs.' 2d Resp. Min. Order at 6; AR Part II at GSA_000417–26.

coordination services," including "arranging, coordinating, monitoring, and controlling freight shipments" and "arrang[ing] transportation services"); Compl. ¶ 20 (describing Crowley as providing "logistical, planning, and transportation coordination services to assist USTRANSCOM with managing a large and complex network of moving goods and cargo"); *id.* ¶ 35 ("Crowley then coordinates transportation services.").

Crowley and defendants both incorrectly attempt to shoehorn into Section 3726(b) a requirement that Crowley be a "carrier" or "freight forwarder" for its contract to be subject to GSA audit authority.  On the basis of that erroneous statutory interpretation, the parties have spilled much ink disputing whether Crowley is a "carrier" or "freight forwarder," with defendants urging that Crowley is both, and Crowley denying it is either and insisting that Crowley is instead a "broker" under 49 U.S.C. § 13102(2).  *See* Compl. ¶¶ 8, 31; Defs.' Mem. Partial J. at 15–18; Pl.'s Opp'n Defs.' Mot. Partial J. & Reply Supp. Mot. Speedy Decl. J. ("Pl.'s Opp'n Defs.' Mot. Partial J.") at 19–23, ECF No. 44; Pl.'s Resp. Min. Order at 9, 20; Pl.'s Opp'n Defs.' 2d Resp. Min. Order at 1–6, 35–36.  The parties' meager justification for importing terms into Section 3726(b) that are otherwise absent is unconvincing.  Crowley urges that a "transportation bill" is "a bill presented by a carrier or freight forwarded [sic] to the government for payment," because the "text of Section 3726(a) refers to an agency that 'receives a bill *from a carrier or freight forwarder* for transporting an individual or property for the United States Government.'"  Pl.'s Resp. Min. Order at 19–20 (emphasis in original).  Yet Section 3726(a) is an entirely different subsection, delegating prepayment auditing responsibility to contracting federal agencies, and does not use or purport to define the term "transportation bill."  Rather, Congress's repeated specific references to carriers and freight forwarders across various subsections of Section 3726, *see, e.g.,* 31 U.S.C. § 3726(a)(1), (c)(1), (d), (h), & (i)(1),

underscores that it knew how to narrowly refer to bills specifically issued by a "carrier or freight forwarder"—but in the case of subsection (b), opted not to do so.

Moreover, besides having no basis in the plain text nor in canons of statutory interpretation, the parties' proposed interpretation of GSA's post-payment auditing authority would exempt brokers from post-payment audits while maintaining GSA's supervisory authority over carriers and freight forwarders.  Such a scheme would encourage agencies to hire third-party middlemen to subcontract with carriers and freight forwarders, thus freeing federal agencies from GSA's post-payment audits because agencies would not deal with the carriers or freight forwarders directly.  The parties provide no explanation why Congress might have intended to create such a loophole.  Accordingly, the fact-laden question of whether Crowley is can be described as a "carrier" or "freight forwarder" need not be decided here and is irrelevant to the scope of subsection (b).[18]

Crowley also urges that, despite the seemingly straightforward language of the provision, GSA lacks the authority to audit the DFTS Contract or any other contract based on the FAR.  As support, Crowley argues that "a government contract cannot be subject to both the CDA and Transportation Act at the same time," and consequently, the Transportation Act's broad grant of auditing authority to GSA must not extend to the CDA-governed contract.  Pl.'s Mem. Decl. J. at 14–18; Pl.'s Opp'n Defs.' Mot. Partial J. at 6–9.  At the core of Crowley's arguments is the faulty premise that application of the CDA to a contract entirely displaces the application of any

---

[18]     The question of whether Crowley is a "carrier" or "freight forwarder" is, however, likely relevant to the application of Section 3726(d), which empowers the government to deduct from amounts "subsequently due a carrier or freight forwarder" any amounts paid that were greater than the allowed rate.  The application of Section 3726(d) need not be determined here, because the question presented by Crowley, and addressed *infra* in Part III.B.3, is whether GSA had the authority to override the Contracting Officer's final decisions by continuing to issue and pursue NOCs—in order words, whether GSA was correct in issuing such NOCs in the first place.  GSA's overall authority to offset overcharges on the basis of NOCs is not at issue, given that, in light of the Contracting Officer's final decisions, GSA should not have continued pursuing such NOCs at all.

provision of the Transportation Act to the same contract.  Crowley derives this conclusion from its reading of two Federal Circuit decisions, *Dalton v. Sherwood Van Lines, Inc.,* 50 F.3d 1014 (Fed. Cir. 1995) and *Inter-Coastal Xpress, Inc. v. United States*, 296 F.3d 1357 (Fed. Cir. 2002). Neither of these non-binding cases, however, addressed GSA's auditing authority in Section 3726(b), but instead dealt with the separate subsection, Section 3726(c), and its pre-1998 precursor then codified at Section 3726(a), authorizing GSA to adjudicate disputes arising from transportation contracts between procuring agencies and their contractors.  Those cases held that the specific dispute resolution provisions of Section 3726(c) "trump" the application of the CDA. *Inter-Coastal Xpress*, 296 F.3d at 1366.  Neither case addressed the scope of GSA's auditing authority at all, and Crowley's reliance on these cases to dispute that authority is therefore misplaced.[19]  Discussion of these cases in some detail illuminates both their irrelevance to resolving the statutory interpretation question of whether Section 3726(b) gives GSA auditing authority over Crowley's DFTS Contract and, at the same time, their pertinence to discussion, *see infra* in Part III.B.3., as to the applicable adjudicatory regime for resolving disputed auditing claims.

   *Dalton v. Sherwood Van Lines, Inc.* arose from a dispute between Sherwood, a freight-forwarding common carrier that transported household goods for U.S. Navy service members, and the U.S. Navy.  50 F.3d at 1016.  Sherwood performed its transportation service in each instance pursuant to government bills of lading, which recited that the bills would be "governed by" regulations implementing the Transportation Act.  *Id.* at 1016, 1019–20.  After Sherwood was paid the agreed-upon amount for its services, service members filed claims with the Navy alleging that their property had been damaged in transit; resultantly, the Navy requested

---

[19]       In fact, the broad grant of auditing authority to GSA articulated in 31 U.S.C. § 3726(b) as extending to "transportation bills," did not exist in Section 3726 at the time *Dalton* was decided.

reimbursement from Sherwood, and when Sherwood refused to pay, began setting off those damage claims against other payments owed to Sherwood.  When Sherwood and the Navy were unable to resolve their dispute, the contractor filed an appeal with the Armed Services Board of Contract Appeals—a tribunal that the government urged lacked jurisdiction over the matter because the CDA did not apply to the dispute.  After the Board denied the government's motion to dismiss, holding that the CDA did apply, the government appealed to the Federal Circuit.

The Federal Circuit vacated and remanded the lower tribunal's decision, holding that only the Transportation Act's dispute resolution procedure—not the CDA's—applied to the dispute between Sherwood and the Navy.  To reach this conclusion, the Federal Circuit examined the CDA and the pre-1998 version of the Transportation Act, 31 U.S.C. § 3726(a)— now incorporated in 31 U.S.C. § 3726(c)—to determine that the "differences between the administrative review provisions of the Contract Disputes Act and Section 3726 confirm that Congress did not intend the two remedial schemes to apply to the same disputes."  *Id.* at 1017.  The *Dalton* Court emphasized the incompatible requirements of the two dispute resolution pathways.  First, while the CDA requires initial action by a contracting officer, then-in-effect 31 U.S.C. § 3726(a) required claims to be submitted to GSA.  *Id.*  Second, appeals must be taken to Armed Services Board of Contract Appeals under the CDA, but under then-in effect 31 U.S.C. § 3726(g), appeals were channeled to the Comptroller General.  *Id.*  Third, no statute of limitations applied under the then-extant CDA, but then-31 U.S.C. § 3726(a) required claims to be submitted within three years.  *Id.*  Given these distinctions, the dispute resolution pathways could not be "complementary." *Id.* at 1018.  The Federal Circuit determined that the Transportation Act, rather than the CDA, applied to the dispute between Sherwood and the Navy because a statute dealing with a "narrow, precise, and specific subject"—there, the Transportation Act's

"system of administrative review specifically designed for transportation services" was not impliedly repealed by the CDA's more general provisions.  *Id.* at 1018.

*Inter-Coastal Xpress v. United States*, too, emerged from a dispute over contract performance between a DoD component, the Defense Logistics Agency, and a contractor providing transportation services.  In 1994, the parties formed three tender agreements, all explicitly pursuant to the Transportation Act, in which Inter-Coastal would load and deliver shipments of perishable items to three locations in the continental United States.  296 F.3d at 1360.  The agreements set out that Inter-Coastal could charge a "holdover" payment when shipments supposed to be picked up and delivered on the same day were instead delivered the following day due to unexpected actions by the government.  *Id.*  After Inter-Coastal began performing the contract, the government repeatedly withheld payments for "holdover" charges, which Inter-Coastal submitted as claims to GSA, seeking to avail itself of the administrative dispute procedures established by 31 U.S.C. § 3726(c) that directed GSA to "adjudicate transportation claims which cannot be resolved by the agency procuring the transportation services, or the carrier or freight-forwarder presenting the bill."  After GSA denied some of the claims and dismissed the others as prematurely filed, Inter-Coastal filed suit under the CDA in the USCFC, which held that the dispute was governed by the Transportation Act, divesting the USCFC of jurisdiction.  *Id.* at 1362.

The Federal Circuit expanded upon *Dalton*'s holding to find that the dispute over the "holdover" charges was properly resolved under 31 U.S.C. § 3726(c) rather than the CDA.  Its reasoning repeated the *Dalton* Court's conclusion that the CDA did not effect an implied repeal of the Transportation Act's more specific administrative dispute resolution provisions.  *Id.* at 1369–70.  Accordingly, the *Inter-Coastal* Court held that the Transportation Act governs "*all*

claims that seek payment for the charges owed on contracts for transportation services," even if the contract does not take the form of a bill of lading, as in *Dalton*. *Id.* at 1369 (emphasis in original).

Crowley urges that these cases stand for the principle that "a government contract cannot be subject to both the CDA and Transportation Act at the same time," but this is too facile an interpretation of the Federal Circuit's pronouncements. Pl.'s Mem. Decl. J. at 14. Instead, the Federal Circuit merely concluded that the diverging administrative review provisions of the CDA and 31 U.S.C. § 3726 at issue in *Dalton* and *Inter-Coastal* cannot both apply to disputes arising from contracts that were entered pursuant to the Transportation Act. This approach comports with the Supreme Court's guidance that courts "confronted with two Acts of Congress allegedly touching on the same topic . . . must . . . strive 'to give effect to both,'" as "repeals by implication are 'disfavored.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) (first quoting *Morton v. Mancari,* 417 U.S. 535, 551 (1974), then quoting *United States v. Fausto*, 484 U.S. 439 (1988)). The problem with Crowley's argument is that no aspect of the CDA conflicts with GSA's authority to conduct pre- and post-payment audits, which involve "audit[ing] transportation billing documents . . . to decide their validity, propriety, and conformity of rates with . . . contracts"—not resolving disputes. 41 C.F.R. § 102.118.400 (defining transportation post-payment audits); 31 U.S.C. § 3726(b). *See also* Defs.' 2d Resp. Min. Order at 21–23 (noting that the provision of Section 3726 analyzed in *Inter-Coastal* is "inapplicable" to the present controversy); Pl.'s Opp'n Defs.' 2d Resp. Min. Order at 46 ("Crowley agrees with GSA's statement that the adjudication of transportation claims under Section 3726(c) is a separate activity from post-payment audits under Section 3726(b)" and that Crowley is only challenging the latter). Consequently, Crowley is incorrect that application of the CDA—

assuming the CDA applies to this Contract, which is discussed further *infra* in Part III.B.3—impliedly repeals the application of 31 U.S.C. § 3726(b).  Section 3726(b), by its plain terms, thus empowers GSA to audit the DFTS Contract.

### 3.   *The CDA Provides the Applicable Dispute Resolution Procedures*

Crowley next argues that, even if GSA is authorized to audit its performance of the DFTS Contract—and GSA is so authorized, *see supra* Part III.B.2—the agency's issuance of NOCs and collection upon them against subsequent payments owed Crowley violated the CDA's provision that a Contracting Officer's decision on a claim is "final and conclusive and is not subject to review by any . . . Federal Government agency."  41 U.S.C. § 7103(g).  This argument arises from Crowley's position caught between two agencies, USTRANSCOM and GSA, and two potential dispute resolution schemes, the CDA and Section 3726(c)'s dispute resolution framework, which is elaborated upon in regulations setting forth the appeals process for GSA's post-payment audit determinations, 41 C.F.R. §§ 102-118.600–665.  Although the USTRANSCOM Contracting Officer sided with Crowley in three Final Decisions, ordering that GSA "shall not" continue to issue NOCs based on GSA's own interpretations of the DFTS Contract because those interpretations were erroneous, *see* AR Part I at GSA_000002 & GSA_000004, and "should refund" the payments already offset, *see id.* at GSA_000010, the Contracting Officer also stated that he had "no authority to order GSA to issue the refund" on amounts that GSA deducted from payments due to Crowley to offset against the issued NOCs. AR Part I at GSA_000010.  Instead, he notified Crowley that "recovery of [erroneously offset] funds is through the GSA Post-Payment Audit dispute process" established by the regulations implementing Section 3726.  *Id.* at GSA_000011.  Crowley disagrees, urging that it "is not required to submit to GSA's dispute resolution process," and the Contracting Officer's Final

Decisions should have been the end of the road for Crowley to dispute GSA's issuance of any NOCs pursuant to those disputed categories of contract interpretation.  Pl.'s Opp'n Defs.' 2d Resp. Min. Order at 46; *see also id.* at 43–46.[20]

Defendants' primary response—that a Contracting Officer's final decisions are reviewed *de novo* in judicial proceedings, *see* Defs.' Mem. Partial J. at 18–19; Defs.' Reply Supp. Defs.' Mot. J. at 5–6, ECF No. 46—is an exemplar of litigants talking past one another.  The thrust of Crowley's argument is that the Contracting Officer's final decisions should have been binding upon GSA, not that the final decisions are binding upon this Court.

In briefing filed subsequently in response to the Court's Minute Order, defendants added another argument, urging that GSA's post-payment audits occur after payment "and thus GSA audits do not conflict with the contracting officer's authority under 7103(g)" at all, "but rather serve to apply and enforce the contract terms to invoices that are audited after payment."  Defs.' 2d Resp. Min. Order at 18.  Indeed, GSA urges that it *does* defer to a Contracting Officer's final decisions—it just never had the chance to "rectify any wrong, if any" because Crowley never "appropriately" disputed the NOCs through the Transportation Act's dispute resolution process. *Id.* at 19.  True, GSA's post-payment audits, standing alone, do not *necessarily* conflict with the authority of the Contracting Officer.  The conflict only arises when the results of those audits— GSA's issuance of NOCs and subsequent attempts to collect upon them—give rise to a "claim" in need to dispute resolution, and GSA ignores the finality of the Contracting Officer's decisions under the CDA based on GSA's insistence that its own appeals process should dictate the validity of the NOCs instead.  This is the core of Crowley's grievance: that its disagreements

---

[20]     Crowley contested only a subset of the NOCs issued by GSA in its claims filed with the USTRANSCOM Contracting Officer, and the record is unclear whether those NOC subsets, representing five categories of disputed contract interpretations, cover the scope of all NOCs issued by GSA against Crowley.

with GSA's NOCs should be channeled exclusively and definitively through the CDA dispute

process, rather than the post-payment audit appeal process scheme set out in regulations

implementing Section 3726.

To begin, a correction to defendants' assertion that that Section 3726(c)(1) is

"inapplicable to this matter" is necessary.  *See* Defs.' 2d Resp. Min. Order at 21.  This subsection

is the only statutory provision empowering GSA with adjudicative authority vis-à-vis

transportation contracts, and provides the statutory authority for the regulatory appeals process

by which GSA determines whether its NOCs are valid.  To be clear, Section 3726(c) is neither a

simple elaboration of GSA's auditing authority under subsection (b), nor provides adjudicatory

authority coextensive with GSA's auditing authority.  As Crowley acknowledges, "transportation

claims" that may be filed with GSA under subsection (c)(1) encompass the sort of disputes that

occur between procuring agencies and contractors, i.e., the contracting parties, similar to the

situations at issue in *Dalton* and *Inter-Coastal*, and disputes between contracting parties arising

from GSA's post-payment audit process regarding the issuance of NOCs and subsequent

deductions under subsection (d).  Indeed, in subsection (c)(2), the statute lists "[t]he date a

deduction under subsection (d) of this section is made" as one of the triggering events starting

the three-year period within which a claim may be filed.  31 U.S.C. § 3127(c)(2).  *See* Pl.'s

Opp'n Defs.' 2d Resp. Min. Order at 46–48 (noting that "the process in Section 3726(c)(1) . . .

includes the situation described in *Inter-Coastal* . . . but also situations like the one presented

here, where GSA has already conducted a Section 3726(b) post-payment audit and made

deductions under Section 3726(d)").  Accordingly, for GSA lawfully to exercise authority in

deciding whether a NOC was validly issued, using its administrative post-payment audit review

procedure, per regulations set out in 41 C.F.R. §§ 102-118.400–445; 102-118.600–665, the

requirements of Section 3726(c) must be met.  *Accord* Federal Management Regulation;

Technical Amendments, 87 Fed. Reg. 32320, 32324 (May 31, 2022) (to be codified at 41 C.F.R.

pt. 102) (citing as authority for Part 102-118 five different statutory provisions, including, most

relevant to the administrative review regulations, Section 3726); Transportation Payment and

Audit, 65 Fed. Reg. 24567, 24570 (April 26, 2000) (to be codified at 41 C.F.R. pt. 101–102)

(also citing Section 3726 for authority to promulgate the regulations in Part 102-118).

 Crowley thus correctly identifies the problem with defendants' assertion that Crowley is

required to challenge the NOCs through GSA's internal dispute process: Section 3726(c) simply

does not encompass Crowley's claims arising from GSA's issuance of NOCs because the

contracting agency has *no dispute* with Crowley.  As explained *supra* in Part III.B.1., GSA's

adjudicative authority is limited to "transportation claims *which cannot be resolved* by the

agency procuring the transportation services, or the carrier or freight-forwarder presenting the

bill."  31 U.S.C. § 3126(c)(1) (emphasis added).  For GSA to assert any decision-making

authority, the contractor and procuring agency "must reach some impasse."  Pl.'s Opp'n Defs.'

2d Resp. Min. Order at 47.[21]  Here, Crowley and USTRANSCOM have no "claim[] which

cannot be resolved"—rather, the dispute as to the validity of the NOCs exists only between

Crowley and a non-party to the contract, GSA.

 The specific facts underlying this dispute explain why the Federal Circuit's resolution of

*Dalton* and *Inter-Coastal* does not control here.  Both of those cases concerned disputes

regarding contract performance between DoD components procuring transportation services and

---

[21] Crowley specifically writes that "*the carrier or freight forwarder* and procuring agency must reach some impasse," but this is an overly cramped reading of the statutory provision.  Pl.'s Opp'n Defs.' 2d Resp. Min. Order at 47 (emphasis added).  The subsection identifies "the agency procuring the transportation services, or the carrier or freight-forwarder presenting the bill," indicating—by use of the disjunctive emphasized by punctuation with use of a comma—that the dispute resolution procedure is not limited to claims brought by carriers or freight forwarders, so long as the claim arises from the agency's procurement of "transportation services" more broadly.  *See supra* Part III.B.1.

the contractors providing the services.  In that context, the parties to the contracts could properly invoke GSA's referee authority to "adjudicate transportation claims which cannot be resolved by the agency procuring the transportation services, or the carrier or freight-forwarder presenting the bill."  31 U.S.C. § 3726(c)(1).  *Accord Inter-Coastal*, 296 F.3d at 1361 ("The Transportation Act's administrative procedures allow a common carrier embroiled in a contract dispute with the government to file and have its claim resolved directly by GSA itself.").  Accordingly, in those cases, the Federal Circuit identified two potentially applicable yet diverging dispute resolution pathways—31 U.S.C. § 3726(c) and the CDA—giving rise to a "choice between a statute (the ICA) that applies broadly in the specific realm of contracts for transportation services, and another statute (the CDA) that applies to government contracts generally."  *Id.* at 1371.  In that context, the Federal Circuit held that the Transportation Act's dispute resolution scheme survived the passage of the CDA and continued to apply to "charges or money owed on contracts for government transportation services."  *Id.* at 1367.  Accordingly, the CDA was displaced from applying to those disputes between transportation contractors and their procuring agencies. There is no such dispute here between Crowley and DoD—no matter the number of NOCs issued by GSA.

Having determined that GSA has no adjudicative authority under Section 3726(c) over Crowley's claim, given that the conflict present in *Dalton* and *Inter-Coastal* triggering GSA's statutory referee role is absent here, the only applicable dispute resolution pathway is the CDA.[22]

---

[22]     One additional feature of *Dalton* and *Inter-Coastal* further distinguishes those decisions from the present case.  Both Federal Circuit cases involved procurement methods—bills of lading in *Dalton*, and tender agreements in *Inter-Coastal*—that were explicitly implemented under the Transportation Act.  *See Inter-Coastal*, 296 F.3d at 1368 ("We take added confidence in reaching this conclusion in this particular case because, as with the [Government Bill of Lading]-based contract in *Dalton*, the tender agreements here specifically stated that the carrier was providing transportation services 'pursuant to the' ICA, a reference that should have alerted a carrier about the ICA's applicability.").  By contrast, the DFTS Contract is a FAR-based contract expressly incorporating the CDA. Defendants urge that this distinction is irrelevant, citing sweeping dicta in *Inter-Coastal* that the Transportation Act should govern all claims "for the charges owed on a contract with the government for transportation services," *see*

Crowley's dispute with GSA's issued NOCs plainly falls within the scope of the CDA. Generally, the CDA applies to "any express or implied contract . . . made by an executive agency for . . . the procurement of services," which encompasses the DFTS Contract made by USTRANSCOM for transportation-related services.  41 U.S.C. § 7102(a)(2).  The CDA directs that "each claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision."  *Id.* § 7103(a).  Although "claim" is not defined by the statute, the FAR has filled this gap, defining a "claim" as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to th[e] contract."  48 C.F.R. § 52.233-1 (2022).  *Accord Navab-Safavi v. Broadcasting Bd. of Govs.*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009) (for guidance in interpreting the term "claim," courts consider "the [Federal Acquisition Regulation ('FAR')] implementing the CDA, the language of the contract in dispute, and the facts of the case" (quoting *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1575 (Fed. Cir. 1995)).  When GSA issues a NOC to a contractor, that contractor's dispute of the NOC—including its "demand" for the "interpretation of contract terms" regarding its liability for purported overpayments, as well as relief in the form of the discharge of the NOC—fall within this definition of a claim.  The application of the CDA to Crowley's disputes arising from GSA's audit of the DFTS Contract is particularly clear in this context, where the contract explicitly incorporated a FAR provision stating that "[t]his contract is subject to 41 U.S.C. chapter 71"—the CDA.  *See* AR Part I at GSA_000024.

---

Defs.' Mem. Partial J. at 14 (quoting *Inter-Coastal*, 296 F.3d at 1372), but the explicit terms of a contract should not be so easily cast aside.  If this case involved a dispute between Crowley and USTRANSCOM (rather than GSA) that resulted in Section 3726(c) being an available means of dispute resolution, it may be the case that *Dalton* and *Inter-Coastal* would be distinguishable on this basis.  As the dissent urged in *Inter-Coastal*, perhaps neither dispute resolution pathway displaces the other, 296 F.3d at 1376–78 (Friedman, J., dissenting); instead, the contracting parties can choose between them in selecting their contract terms.  Regardless, that is not the present case and need not be decided.

Oddly, Crowley cites a non-binding Armed Services Board of Contract Appeals decision, *Maersk Line Ltd., Inc.*, ASBCA No. 58779, 14-1 BCA ¶ 35,589, standing for exactly this conclusion—but in support of its argument that GSA lacks authority to audit FAR-based contracts at all.  Pl.'s Mem. Decl. J. at 17; Pl.'s Opp'n Defs.' Mot. Partial J. at 6–7.  To the contrary, the ASBCA explicitly declined to decide whether GSA was authorized to audit FAR-based contracts.  Instead, the ASBCA held that a contractor, Maersk Line Limited, had correctly brought a claim under the CDA to its Contracting Officer, challenging GSA's issuance of NOCs arising from its FAR-based transportation services contract.  *Maersk Line Ltd., Inc.*, ASBCA No. 58779, 14-1 BCA ¶ 35,589.  The Contracting Officer had taken the position that he lacked authority to resolve the NOC dispute, but the ASCBA disagreed, holding that "Maersk's [] request for a contracting officer's final decision is a claim seeking the contracting officer's interpretation of the contract terms and relevant FAR and CDA provisions with regard to the GSA overcharge notices," and "falls squarely within the Board's CDA jurisdiction."  *Id.* at 12.  While not controlling, the ASCBA's sound reasoning is directly applicable here.

Accordingly, because GSA's adjudicative authority under Section 3726(c) cannot be invoked due to the lack of any dispute between the contracting agency and Crowley, and the CDA is expressly incorporated as the dispute resolution process agreed-to by the contracting parties, the CDA applies to Crowley's claim regarding the issued NOCs.  Thus, the CDA's dispute resolution procedure, rather than the Transportation Act's administrative review procedure, applies.  Here, GSA is properly relegated to an advisory capacity.  The procuring agency, USTRANSCOM, is best suited to interpret the terms of the contract it negotiated and implements, and to exercise final decision-making authority over disputes relating to the outcome of GSA audits.  This is why the CDA is written broadly, establishing a "comprehensive

framework for resolving contract disputes." *Menominee Indian Tribe v. United States*, 614 F.3d 519, 521 (D.C. Cir. 2010).  That framework channels disputes over GSA's issuance of NOCs to the desk of the appropriate Contracting Officer, which Contracting Officer has the last word on the interpretation of the DFTS Contract vis-à-vis other federal agencies, including GSA. Contrary to the Contracting Officer's guidance, and defendants' arguments in litigation, Crowley is not required to challenge each NOC through GSA's post-payment audit appeals process.

## IV.    CONCLUSION

GSA properly exercised its broad delegation of statutory authority under Section 3726(b) when conducting post-payment audits of the DFTS Contract.  GSA erred, however, in asserting that disputes arising from the issuance of NOCs in the exercise of that audit authority are properly channeled through GSA's administrative review process, rather than the CDA, which empowers procuring agency Contracting Officers with final decision-making authority to resolve such conflicts.  Accordingly, Crowley's Motion for Speedy Declaratory Judgment Hearing is granted in part and denied in part; defendants' Motion for Partial Judgment on the Pleadings is granted; and defendants' Motion to Dismiss is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: July 28, 2023

_____
**BERYL A. HOWELL**
United States District Judge